Receipt #066828

ORIGINAL

FILED
JUL 1 1 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Superior Helicopter LLC
2794 Foothill Blvd.
Grants Pass, Oregon 97526

and

Rainier Heli-Lift, Inc.
12515 Willows Road NE, Suite 125
Kirkland, Washington 98034,

Plaintiffs

v.

United States of America,

Defendant.

No. 07-518 C

**COMPLAINT FOR DECLARATORY JUDGMENT, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

COME NOW Plaintiffs, Superior Helicopter LLC ("Superior") and Rainier Heli-Lift, Inc. ("Rainier"), through their undersigned counsel, and file this Complaint for Declaratory Judgment, Temporary Restraining Order, and Preliminary and Permanent Injunctive Relief against the Defendant. In support of their action, Superior and Rainier state as follows:

**Parties**

1. Plaintiff Superior is in the business of providing helicopter services to government and commercial customers. Superior's principal place of business is in Grants Pass, Oregon.

2. Plaintiff Rainier is in the business of providing helicopter services to government and commercial customers. Rainier's principal place of business is in Kirkland, Washington.

3. Defendant is the United States of America, acting through the United States Forest Service ("USFS" or "Agency") and its National Interagency Fire Center ("NIFC") located in Boise, Idaho.

## Procedural Background

4. This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. § 1491 and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

5. At issue is the Agency's determination and findings ("D&F") to override the automatic stay that went into effect pursuant to 31 U.S.C. §§ 3553(d)(3)(A)(i) and (d)(4)(B) upon the filing of timely post-award protests at the U.S. Government Accountability Office ("GAO") by Erickson Air-Crane, Inc. ("Erickson") on June 22, 2007 and by the Plaintiffs on June 29, 2007. Erickson and the Plaintiffs filed their protests against the Agency's rejection of their proposals to provide Heavy and Medium Helicopter Services in response to Request For Proposals No. AG-024B-S-07-0008 (the "RFP"). The helicopter services being solicited will be used primarily for aerial firefighting purposes.

6. Plaintiffs on July 3, 2007received official notification that the GAO decision on their protests will not be due until October 9, 2007.

## Nature of the Present Action

7. Before this Court, Plaintiffs now seek a temporary restraining order, and declaratory and injunctive relief, to set aside the Agency's D&F overriding the automatic stay on the grounds that the D&F was arbitrary and capricious, and otherwise not in accordance with law. Specifically, Plaintiffs seek to enjoin the Agency's implementation of the D&F because the USFS has failed to adequately justify and support an override of the automatic stay provisions, as required by the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3553(d)(3)(C)(i)(I)-(II) and relevant decisions of this Court.

8. Unless the Court enjoins the Agency's implementation of the D&F, Plaintiffs will suffer irreparable harm because the contracts awarded by the USFS pursuant to the RFP have a duration for each year ranging from 90-180 days of paid standby, plus flight hours. Thus, even if Plaintiffs were to prevail on their GAO protests in early October 2007, Plaintiffs will be severely prejudiced because the first year of the contracts will have been nearly completed by other contractors during the current fire season.

## Jurisdiction and Venue

9. This Court has original jurisdiction over post-award protests pursuant to 28 U.S.C. § 1491(b)(1) and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1491.

## Factual Background

11. The RFP was issued on April 6, 2007 and instructed offerors to submit technical and business/price proposals in response to the USFS's requirements for heavy and medium helicopter services. The RFP's schedule contained 35 line items, each covering specified National Forest locations. The RFP contemplated the award of multiple "exclusive use" contracts for a one-year base period and two one-year option periods during which the successful contractors would be required to have the offered helicopters available for the USFS's exclusive use for 90-day, 150-day or 180-day durations.

12. Superior and Rainier, both experienced contractors in the helicopter firefighting industry, submitted proposals in response to the RFP by the May 10, 2007 due date. Superior and Rainier, as well as other offerors, proposed Kmax helicopters manufactured by Kaman Aerospace. Superior's and Rainier's Kmax helicopters are currently used for fighting fires under "call when needed" ("CWN") contracts awarded by the USFS. The CWN contracts are in effect until April 30, 2008.

13. On June 13, 2007, the USFS sent letters to both Superior and Rainier notifying them that their proposals had been rejected on the basis that Superior and Rainier incorrectly used the standard Rotorcraft Flight Manual charts, rather than the K-1200 Rotorcraft Flight Manual Supplement #1 charts, to compute the Interagency Helicopter Load Calculation. Superior was also informed that its equipment lists did not conform to the RFP requirements. The USFS also provided a list of the winning contractors. But for the USFS's rejection of their proposals, Superior was in line to win at least two contract awards and Rainier was in line to win at least one contract award. Each contract has an annual value in excess of $1 million.

14. On June 25, 2007, Superior and Rainier representatives attended the requested and required debriefing at the NIFC in Boise, Idaho. During the debriefing, Superior's Director of Aviation Operations, Mr. Andrew Mills, the lead spokesman for the Plaintiffs, detailed the reasons that their use of the standard charts was correct and demonstrated to the USFS officials that, in any event, the helicopter load calculations were correct using either the standard charts or the Supplement #1 charts. The USFS's national Helicopter Aviation Specialist, Mr. Chuck Taylor, confirmed that Mr. Mills' demonstration was "probably correct." In response to Mr. Mills' query as to what was wrong with Superior's equipment lists, Mr. John Grogan, a Helicopter Maintenance Specialist who was involved in the evaluation of the proposed equipment lists, stated that Superior might well have put all the correct information in its proposal. Mr. Grogan added that he "was not willing to say the [Superior] proposal was deficient." The Contracting Officer, Mr. Gomez, then laid the issue to rest by saying unequivocally that Superior's proposal had <u>not</u> been rejected for equipment list problems; rather the equipment list point was mentioned by USFS in its rejection letter "for clarification" purposes only.

15. On June 29, 2007, Superior and Rainier filed protests at the GAO against the USFS's rejection of their proposals. Although the protests were filed within the necessary time frame to invoke the CICA automatic stay provisions, a stay of performance was already in effect due to the filing of a timely protest by Erickson on June 22, 2007.

16. On July 9, 2007, Plaintiffs learned that the USFS had executed a "Findings and Determination" ("D&F") to override the automatic stay. The USFS had determined that performance of the awarded contracts is in the best interests of the United States and urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protests.

17. The USFS is presently obtaining and can continue to obtain required helicopter services needed for firefighting purposes at all National Forest locations during the pendency of the GAO protests through the existing "Call When Needed" contracts held by Plaintiffs and virtually all of the other helicopter operators. *See* Affidavits of Andrew Mills and Richard Larew, attached hereto. Therefore, the USFS cannot properly justify a "best interests" or "urgent and compelling" override of the automatic stay.

**<u>COUNT I – The USFS's Actions Are Arbitrary And Capricious And Contrary To Law</u>**

17. Plaintiffs reallege and incorporate herein the allegations contained within paragraphs 1 – 16 as set forth above.

18. The USFS's D&F to override the CICA automatic stay provisions is arbitrary and capricious and without a rational basis, and contrary to applicable law.

19. Plaintiffs have been and will be directly harmed by the USFS's improper actions.

20. Accordingly, the USFS should be enjoined from overriding the CICA automatic stay until such time as the GAO issues its decisions on Superior's and Rainier's protests.

WHEREFORE, Plaintiffs pray this Court to enter judgment in Plaintiffs' favor and against the USFS as follows:

a) Enjoin the USFS from overriding the automatic stay until the GAO issues its decisions on Plaintiffs' protests;

b) Declaring that the USFS's D&F is unjustified and without legal authority; and

c) Granting Plaintiffs such further relief as the Court may deem just and proper.

Respectfully submitted,

Gilbert J. Ginsburg
Attorney & Counselor-At-Law
1250 24th Street, NW
Suite 350
Washington, DC 20037
Phone: (202) 776-7772
Fax: (202) 776-7773
Email: gilgins@aol.com

Attorney of Record for Plaintiffs
Superior Helicopter LLC and
Rainier Heli-Lift, Inc.

Of Counsel:

Timothy Sullivan

Katherine S. Nucci

Thompson Coburn LLP
1909 K Street, N.W. Suite 600
Washington, D.C. 20006-1167
www.thompsoncoburn.com
P: 202.585.6930
F: 202.508.1028
M: 703.508.1156

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Superior Helicopter LLC<br>2794 Foothill Blvd.<br>Grants Pass, Oregon 97526<br><br>and<br><br>Rainier Heli-Lift, Inc.<br>12515 Willows Road NE, Suite 125<br>Kirkland, Washington 98034,<br><br>Plaintiffs<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. ______________ |

## AFFIDAVIT OF ANDREW MILLS

ANDREW MILLS, being duly sworn, deposes and says:

1. I am the Director of Aviation Operations for Superior Helicopter LLC. I have held this position for the past five years.

2. I have been involved in the helicopter business for over 20 years. During that period, I have become very knowledgeable with respect to the needs of the U.S. Forest Service ("USFS"), and I am especially aware of the agency's needs relating to the use of helicopters to fight forest fires.

3. I was deeply involved in the preparation of Superior's proposal in response to Solicitation No. AG-024B-S-07-0008 (the "solicitation"). I also attended the June 25, 2007 debriefing hosted by the USFS in Boise, Idaho. I have attached my summary of that debriefing, and I hereby confirm that it represents my recollection of that session. (Attachment 1).

4. Based on my understanding of the award criteria, I believe that Superior should have been awarded a contract for at least two of the line items in the solicitation.

5. As our Complaint in this matter indicates, the USFS listed two primary reasons for rejecting Superior's proposal in a letter to Superior dated June 13, 2007. First, that Superior

failed to use the USFS's Rotorcraft Flight Manual Supplement No. 1 ("Supplement #1") to calculate the gross payload of Superior's helicopters, even though the solicitation did not direct offerors to use that form. Second, the USFS contended that Superior's equipment list, required by Section C5.16 of the solicitation, was not adequate for the USFS's evaluation.

6. The USFS contracting officer, Mr. Frank Gomez, reiterated those two positions at the debriefing. With respect to the first position, we advised Mr. Gomez that the solicitation did not require our technical information to be submitted on the form (Supplement #1) that he contended was mandatory, and we also noted that Superior's technical submission set forth the correct gross payload and demonstrated that Superior satisfied the USFS's requirements regardless of which chart was used. Once we explained our position, the USFS technical specialist, Mr. Chuck Taylor, agreed that we were "probably correct" on that point. Despite their acknowledgement that the information we had submitted was adequate for purposes of their technical evaluation, the USFS contracting officer could only state that it was the USFS's policy that we use Supplement #1 in order to demonstrate technical compliance.

7. With respect to the second issue mentioned as a basis for Superior's rejection, we were advised at the debriefing by the USFS's Mr. John Grogan, a helicopter maintenance specialist who had conducted the evaluation of Superior's equipment list, that the USFS wanted to see information in our proposal that provided a weight and arm for all removable items on the aircraft equipment list. In response, we pointed out to the USFS representatives that the solicitation, at Section C5.16, only required offerors to list weight and arm separately if items are easily removable or reconfigurable. We then showed the USFS representatives our equipment list and pointed out that the only easily removable or reconfigurable item on our list was a snorkel, and that we had listed the weight and arm for the snorkel on the balance sheet. We also noted that we had submitted two separate weight and balance sheets for the firetank because it becomes part of the aircraft when it is installed and is part of the basic aircraft weight. Mr. Grogan then stated that Superior may have in fact put all the correct information in its proposal. Mr. Grogan said he was "not willing to say the Superior proposal was deficient." After a brief discussion on another item, the contracting officer told us that Superior's proposal had not been rejected because of an equipment list item. We mentioned that the equipment list item was cited in the June 13 letter, but he said it was in there only for clarification purposes and not for rejection purposes.

8. I have learned that the USFS has issued a written determination to lift the "stay" that has been in effect under the solicitation following the Erickson protest and the Superior and Rainier protests on the grounds that urgent and compelling circumstances exist and that lifting the stay is in the USFS's best interest. The new stays went into effect Friday, June 29, upon the filing of the protests at the GAO by Superior and Rainier Heli-Lift, Inc. Those protests were docketed as B-299909.2 and B-299909.3, respectively. Based on my knowledge of the industry and the current situation on the ground, I do not believe that the USFS can justify such a determination.

9. Superior is one of many qualified companies that currently hold contracts to provide the USFS with helicopters on a "Call When Needed" ("CWN") basis. The period of performance under Superior's contract lasts until mid-2008, and most of the other Type I helicopter operators have similar contracts. These CWN contracts give the USFS the ability to

call on any CWN contractor to meet its needs, and the agency can do so for another year. Superior is currently performing services under its CWN contract and is ready, willing and able to continue to meet the USFS's needs if called upon under that contract.

10. Nearly all of the companies that are to be awarded these Exclusive Use contracts under this solicitation currently have existing CWN contracts and are available right now, along with the rest of the CWN fleet, which is approximately 200 aircraft. These same aircraft will continue to fight fires whether they have Exclusive Use contracts or not. In fact, many of the awardees and others, including Superior and Rainier, are currently fighting fires in Utah, California, and Montana on a CWN basis.

11. The solicitation calls for the awards of "Exclusive Use" contracts, a type of contract that will give the USFS the right to have exclusive use of a company's helicopter for periods of 90, 150 or 180 days. The solicitation contains 35 line items, and Superior submitted bids and pricing on all but one of them.

12. The USFS's findings and determination document correctly notes that a contractor does not have to accept a CWN call from the USFS. In my experience, and in the experience of my colleagues at Superior, there is no commercial short-term helicopter work available that is as lucrative on an hourly and daily basis as CWN firefighting. In our experience, it is a common industry practice for most operators to accept CWN work at the expense of other types of lift work because it is (a) more lucrative, (b) very seasonal and must be done when the work is available (other types of work can be delayed or rescheduled to take place at other times of the year), and (c) many operators, including Superior, have invested tens to hundreds of thousands of dollars in fire-specific equipment just to be available and ready for CWN work when it is available. At Superior we do not make other commitments during July, August and September because we know that we have to be available for the CWN work that will be there. I know that many of our competitors do the same.

13. I have carefully reviewed Paragraph 12 of the USFS's findings and determination document, and I believe there are several statements that are either misleading or incorrect. I will deal with them in order.

(a). While the USFS states that "there are only 4 heavy lift helicopters currently under contract," that only gives part of the full picture. The truth is that there are only four heavy lift helicopters under *Exclusive Use* contracts, while there are more than 60 heavy lift helicopters under existing CWN contracts with the USFS. This CWN fleet includes all of the heavy lift helicopters that were selected for award of Exclusive Use contracts under the solicitation at issue in our GAO protest.

(b). The aircraft that are available under CWN contracts are widely geographically available and are dispatched and assigned to fires by the National Interagency Coordination Center in Boise, Idaho. There are currently approximately 200 helicopters available under the USFS's existing CWN contracts, and even a cursory look at the Government Web Tracker page will show that they are widely distributed throughout the United States. In fact, Superior, and most CWN operators, commonly pre-position their aircraft at their own expense near fire-prone areas in hopes of getting fire assignments as the season develops. This practice saves the

Government money since it is done at operator expense, and it allocates resources over a wide area of trouble spots when fires begin to flare up, since proximity of aircraft to a fire helps in being assigned to that fire. The USFS's Automatic Flight Following website currently shows many more than 100 aircraft available for firefighting spread throughout the most fire-prone parts of the United States, the vast majority of which are currently active in fire fighting activities. See Attachment 2.

(c). Aircraft are assigned and controlled by the NICC, and when a new fire breaks out, or if one fire grows and requires additional assets, the NICC has the capability to get aircraft released from one fire and reassigned to another. Last summer, we had one heavy lift aircraft that moved from fire to fire throughout the Sierra Nevada mountains based on the NICC's directives on both a regional and a national level. In other words, instead of being assigned to a fire and then getting released and waiting for another CWN call, we were reassigned directly from one fire to another. The mechanism definitely is in place to move assets from one incident to another, and the USFS can do this in conjunction with the incident commander at each location. Thus, while the statement in Para. 12(b) of the findings and determination document is true to a point, *i.e.*, current CWN helicopters "are under the control of the incident commander for specific needs of that incident, and are generally not available to meet a strategic objective supporting more that one incident," the fact is that it is only true until NICC decides, as they frequently have, that they have a bigger problem somewhere else. When that happens, they ask the incident commander to release the helicopters from his fire and they are immediately reassigned to a larger strategic objective. This happens regularly under the existing system.

(d). I am very concerned about some statistics cited by the USFS in Para. 12(b) of the findings and determination document. They say, "At the beginning of the 2006 season, there were over 241 helicopters under CWN contracts with the Forest Service for interagency use; only about 40% of them were available for firefighting use and the actual numbers fluctuated." This could give a reader the wrong impression of the true situation. First, 40 percent of 241 helicopters gives the USFS 96 helicopters, far in excess of what will be available under the contracts that are about to begin if the stay is lifted. Second, I am not surprised that only 40 percent were available "at the beginning of the 2006 season" since many operators bring aircraft off of other contracts or wrap-up other commitments in order to become available for firefighting, and this normally occurs in the early part of the summer. In other words, the USFS statistic reflects the *early* part of the summer of 2006. The only fluctuation that I am aware of is that that number dramatically increased so that, by early July, 75 percent of the fleet was probably available. At Superior, for example, we had one helicopter return from overseas in late spring or early summer, a second helicopter finishing logging commitments in late June, and a third helicopter completing a seismic project. All three of these aircraft would have been considered unavailable at the start of the season, but were made available by the time the season was in full swing in July. The USFS's own practices acknowledge this fact of life: Most of the USFS's Exclusive Use contracts under the disputed solicitation do not begin until after June 15, with several starting in July.

(e). The USFS often puts CWN aircraft on "severity" status, *i.e.*, when there is a very high fire danger in a particular area or they are expecting dry lightning or other things that start fires. The USFS simply assigns CWN aircraft to strategic locations near that area on a paid

CWN daily rate on standby and ready to fly for initial attack. When the danger has passed, the USFS releases the helicopter from the severity contract or moves it to another location. Based on our experience with the USFS, I believe this is exactly what it will do with the Exclusive Use aircraft if the stay is lifted, but the fact is that the USFS has that mechanism in place now and has implemented it with several CWN contracts throughout the west.

14. In Paragraph 14 of the USFS's findings and determination document, the point is made that if performance is not continued, "the Forest Service and its interagency partners will not have 35 medium and heavy helicopters available for their exclusive use for initial attack and large fire support, that have been inspected, approved for use, and stationed at designated locations with pilots and crews ready to deploy at a moment's notice." As I have indicated above, through voluntary pre-positioning, CWN severity standby arrangements, and the sheer numbers of available CWN aircraft, the USFS has as many or more aircraft available as it would under the challenged Exclusive Use contracts. In addition, every single CWN helicopter was inspected and approved for use by the USFS prior to the beginning of this fire season, under precisely the same process used to inspect Exclusive Use aircraft.

15. As I understand it, the USFS's plan is to use the Exclusive Use contracts as much as possible before tapping into the CWN contracts.

16. We filed our protest at the Government Accountability Office ("GAO") on Friday, June 29, 2007, and I understand that the GAO has 100 days to decide the protest. If the stay is lifted, therefore, a GAO decision in our favor 100 days from now would be a victory on paper only because the 90-day line items will have been completed, and the line items for 150 and 180 days will be well underway, and Superior will be deprived of this significant contracting opportunity.

17. Superior depends on these USFS contracts for approximately 50 percent of its annual revenue, and being deprived of this business would cause our company serious financial harm. We have made significant investments to provide the USFS with state-of-the-art firefighting equipment. For example, we participated in a joint venture with Kawak Aviation Systems of Bend, Oregon to design and build the Firemax tank and snorkel system that gives Superior unique firefighting capabilities. We realize that we did this voluntarily, but the money we have spent to do this will not be recoverable if we are not awarded this business, and this loss would cause significant financial harm to Superior.

18. The USFS's decision to lift the stay works a type of double-whammy on Superior. First, because the GAO process takes about 100 days, we will be deprived of the right to perform the Exclusive Use contracts that we believe we are entitled to under this solicitation. Second, because the USFS has announced its intention to move aggressively to use the Exclusive Use contracts wherever and whenever possible, the helicopters we currently have performing under our CWN contracts undoubtedly will be replaced by the new Exclusive Use helicopters. If this scenario develops, Superior will be partially or totally shut out of the firefighting business for the balance of this year, and that will constitute a severe financial blow to the company.

And Further Affiant Saith Not.

Andrew J. Mills

Andrew Mills

STATE OF OREGON )

CITY/COUNTY OF Josephine )

Subscribed and sworn to before me this 10th day of July, 2007.

OFFICIAL SEAL
DEBRA J KING
NOTARY PUBLIC - OREGON
COMMISSION NO. 373638
MY COMMISSION EXPIRES OCT. 19, 2007

Debra J. King

Notary Public

My Commission Expires: 10-19-2007

# ATTACHMENT 1

# Superior Helicopter LLC

**USFS Post-Bid Debriefing Conference held 25 June,2007**

On 25 June representatives of Superior Helicopter attended a post-bid debriefing conference held in Boise, Idaho at the National interagency Coordination Center aviation contracting office. This conference was officially requested by Superior on 13 June upon receiving a notice of bid rejection based on technical grounds. The date was selected by USFS NIFC contracting officer Frank Gomez as the first available date for the de-briefing.

Attending the briefing: USFS personnel – Frank Gomez, contracting officer; Chuck Taylor, National Helicopter Aviation specialist; John Grogan, Helicopter Maintenance Specialist.

Superior personnel- Carson Johnson, V.P. Aviation; Andy Mills, Director of Aviation Operations; John Vogan, Assistant Chief Pilot.

Also in attendance with our permission were representatives of two other Kmax operators:

Rainier Heli-Lift: Lon Halvorson, President; Lash Larue, V.P.; Steve Wright, V.P. Operations.

Mountain West Helicopters: Brian Burr, President; Barry Levinson, legal counsel.

The other Kmax operators were rejected for the same principal reason as Superior, so we had a joint meeting on this issue. The tone of the meeting was professional, with no fingerpointing or personal attacks. Andy Mills was the primary spokesman for the groups.

Frank expressed that our bids were rejected on technical grounds because we did not utilize the Supplement #1 to calculate our gross payloads. He was asked why the USFS did not mandate which chart we were expected to use, since there are two charts for the aircraft, and he replied that it was USFS policy to use the Supplement #1 and it was our responsibility to know this. He asked us why we did not bring it up at the pre-bid conference and we replied this was because in our minds this issue was settled three years ago and no operator had used the chart since that time for any USFS load calculations. The chart was expressly created to demonstrate that the Kmax met minimum criteria for a type 1 helicopter for CWN contracts, and was done because USFS threatened to not renew our CWN contracts if we did not produce such a chart. We asked him where in the current performance based contract requirements it specified that we use this chart and he stated that minimum engine specification meant we had to use the Supplement.

He was then asked the following: in 2005 all the Kmax operators submitted exactly the same load calculations, responding to exactly the same specification wording in the contract, and none of those bids were rejected on technical grounds. He replied that 2005 was a less formalized contract process (although the two Exclusive Use contract solicitations are virtually identical), and that this time the process was more formalized and they had more bidders and were held to different standards. This was a recurrent theme in his answers about the contract.

We then asked that if the contract process had changed and was more internally formalized, didn't the USFS have a responsibility to tell us this and be specific as to particular performance charts they might require, since nothing was said prior to acceptance of the solicitations. Also, we asked why USFS did not simply call the operators if there was a widespread technical mis-understanding and allow submission of revised documents. He again replied this was a more formalized process, and he was not at liberty to do this, even though it was pointed out to him that there is specific wording in the contract that the contracting officer has the ability to contact bidders about technical clarifications. He had no answer to this.

It was the position of the technical group headed by chuck Taylor that we should have entered 10,800 lbs. on line 7 b of the contract, instead of approximately 11,700 lbs. that the operators submitted. This figure represents what they

considered the minimum load for the Kmax at that altitude and temp. At this juncture, we demonstrated to them that even utilizing the Supplement #1 charts, and adding available power back in, we still reached our 58 PSI maximum threshold and therefore the 11,700 lb. figure we submitted was correct in any event. They were quite taken aback at this. Chuck Taylor was honest and agreed that utilizing this chart with this power available we did reach that gross weight. Their position in the past was that they don't want power available added back in to the chart, because they were trying to achieve a "level playing field" among aircraft types. We replied that this was a good goal, but that the way the Kmax was certified, we must add power back in to our baseline in order to get to the same level playing field as other aircraft, and the example of a S-61 or S-64 using all available sea-level shaft horsepower in their charts was mentioned. Frank at this point asked Chuck if this was true, and if it was true we arrived at the same gross weight rating with either chart, and Chuck said yes , it probably was.

Frank then asked us why we did not bring these points out before, and we replied strongly that we had been very consistent on this issue and referred him to the correspondence that had passed between us over the last few years stating the same things. It was also raised by us that we had been submitting load calculations and dispatch performance criteria using the standard charts all along with the technical group's blessing. He replied that that was not the same as a contract bid, but faltered when we questioned the consistency issue.

Upon returning to the point that the charts yield the same number if power available is added back in, he really had no suitable reply to that and appeared to be completely unaware that this was the case. He then asked us if we submitted the Supplement charts as our supporting documentation graphics or the standard charts, and we repled the standard charts, and he indicated this was wrong. He was then asked directly if he was stating that he rejected our bid because we put the wrong graphic in our response, because our rejection letter only states we entered the wrong gross weight rating. He said no and appeared to back up on that issue.

The upshot of further discussion was that they had no clear response to the fact that our number was correct, repeatedly stating only that it was their policy that we use the Supplement (not addressing the fact that even with the Supplement we were correct).

Regarding the second item mentioned in our rejection letter, which was that our equipment list in section 5.16 did not allow for proper evaluation, we asked for specific clarification on why it was not correct. John Grogan was the head of this group and replied that they wanted to see a weight and arm for removalbe items on the aircraft equipment list. It was pointed out to him that the section actually states that only items that are easily removable or re-configurable on the aircraft need a weight and arm listed separately. We showed him our equipment list, and pointed out that the only easily removable or re-configurable item was the snorkel, and the weight and arm were listed on the balance sheet. We also pointed out that we submitted two separate weight and balance sheets for the firetank, because it is part of the aircraft when installed and is part of the basic aircraft weight. He replied that we may very well have put all the correct information in our bid, but they had 70 aircraft bids to process and perhaps did not find the information easily and so came up with this comment. He re-iterated that our bid response may very well have been correct in this area, and was not willing to say we were deficient. He mentioned the weight of a survival kit, and was asked if our bid was rejected because we did not list the weight of the survival kit, which we leave in the aircraft all the time anyway. He said it was not. Frank Gomez then stated unequivocally that we were not rejected for the equipment list item. When we mentioned that it was in the letter he again stated that it was pointed out for clarification but that it was not a basis for rejection, the engine chart issue was the basis. He also picked up our copy of the bid and thumbed through it repeatedly, but said nothing else about it.

We also brought up that based on the price abstract, we knew that we would have been competitive on three contracts (at least) from a price point. He stated that they did not evaluate our prices at all, because we were rejected technically prior to price consideration or performance evaluations. He was questioned about why they did not consider best performance or best price and then try to resolve minor technical issues, and replied again that this was a formalized process and they evaluated the bids based on technical considerations first and performance and price were considered later, verifying that none of the Kmax operators present got to that stage.

Our feeling at the end of the meeting was that they did not have satisfactory answers for our rejection other than to keep stating that they wanted us to use the supplement and would take the matter of using available power and the standard charts under consideration for future contracts, but the problem was ours. They had no good response to our specific arguments and it was obvious Frank Gomez was not happy with the meeting. Chuck stated he would be busy until later in the summer and would talk to us about revising their stance on the chart issue then. We wre of the collective opinion Chuck wanted to work with us on this, but Frank did not.

# ATTACHMENT 2


Legends
Resource Legend
Flag Background Colors
Resource At Base
Active Resource
Inactive Resource
Lost Contact
Current Resource
Java Applet Window

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Superior Helicopter LLC<br>2794 Foothill Blvd.<br>Grants Pass, Oregon 97526<br><br>and<br><br>Rainier Heli-Lift, Inc.<br>12515 Willows Road NE, Suite 125<br>Kirkland, Washington 98034,<br><br>Plaintiffs<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. ___________ |

## AFFIDAVIT OF RICHARD L. LAREW

RICHARD L. LAREW, being duly sworn, deposes and says:

1. I am the Executive Vice President of Rainier Heli-Lift, Inc. ("RHI") I have worked at RHI for over two years. Before that I worked at ERA Helicopters for 27 years, and I was the Executive Vice President at the time I left ERA.

2. I have been in the firefighting business for the last 29 years, and I am intimately familiar with the needs of the U.S. Forest Service, particularly as they relate to the use of helicopters to fight forest fires.

3. I was one of two senior RHI executives who prepared and approved the proposal that RHI submitted in response to Solicitation No. AG-024B-S-07-0008 (the "solicitation"). I approved all pricing and strategy decisions in connection with our proposal. Under this solicitation, the Forest Service has asked for technical and cost proposals for 35 separate line items, all of which require the contractor to commit a helicopter to the Forest Service's exclusive use for periods of 90, 150 or 180 days. Based on my understanding of the evaluation criteria, I believe that RHI should have been awarded a contract for at least one line item under the solicitation.

4. I attended the June 25, 2007 debriefing that the USFS conducted, and I have read the summary of that debriefing prepared by Mr. Andy Mills of Superior Helicopter, LLC. I hereby confirm everything in Mr. Mills's summary. In addition, I believe it is important to note that the contracting officer mentioned several times during the debriefing that the USFS had "more than enough" offerors under the solicitation, and that this abundance of offerors was the reason he did not conduct clarifications with Superior and RHI.

5. I have been advised that the Forest Service has issued a determination that the "stay" that has been in effect in connection with the solicitation must be lifted because of urgent and compelling circumstances and that doing so will be in the Government's best interest. I do not believe that determination accurately reflects the Forest Service's actual status at this time.

6. RHI is one of many qualified companies currently holding contracts with the Forest Service to provide helicopters on a "Call When Needed" ("CWN") basis. RHI's contract is good until April 30, 2008, and we believe that the other contracts have the same period of performance. Based on public information that I obtained from the USFS, there are at least 197 qualified helicopters available to the USFS under its existing CWN contracts. The USFS has the ability to call on anyone in this stable of qualified, experienced contractors to meet its existing needs, and can do so for nearly another year. Speaking for RHI, we are ready, willing and able to meet the Forest Service's needs if called upon under that contract and are presently performing firefighting services under that contract. In my view, the USFS has more than enough helicopters under contract to meet its existing needs and would have enough even if those needs were to greatly expand.

7. The USFS's findings and determination document correctly notes that a contractor does not have to accept a CWN call from the USFS. In my experience, and in the experience of my colleagues at Rainier, there is no commercial short-term helicopter work available that is as lucrative on an hourly and daily basis as CWN firefighting. In our experience, it is a common industry practice for most operators to accept CWN work at the expense of other types of lift work because it is (a) more lucrative,(b) very seasonal and must be done when the work is available (other types of work can be delayed or rescheduled to take place at other times of the year), and (c) many operators, including Rainier, have invested tens to hundreds of thousands of dollars in fire-specific equipment just to be available and ready for CWN work when it is available.

8. I have carefully reviewed Paragraph 12 of the USFS's findings and determination document, and I believe there are several statements that are either misleading or simply wrong. I will deal with them in order.

(a). While the USFS states that "there are only 4 heavy lift helicopters currently under contract," that only gives part of the full picture. The truth is that there are only four heavy lift helicopters under *Exclusive Use* contracts, while there are more than 60 heavy lift and medium-lift helicopters under existing CWN contracts with the USFS. This CWN fleet includes all of the heavy lift helicopters that were selected for award of Exclusive Use contracts under the solicitation at issue in our GAO protest.

(b). The aircraft that are available under CWN contracts are widely available and are dispatched and assigned to fires by the National Interagency Coordination Center ("NICC") in Boise, Idaho. There are currently approximately 200 helicopters available under the USFS's existing CWN contracts, and even a cursory look at the Government Web Tracker page will show that they are widely distributed throughout the United States. In fact, Rainier, and most CWN operators, commonly pre-position their aircraft at their own expense near fire-prone areas in hopes of getting fire assignments as the season develops. This practice saves the Government money since it is done at operator expense, and it allocates resources over a wide area of trouble spots when fires begin to flare up, since proximity of aircraft to a fire helps in being assigned to that fire. The USFS's Automatic Flight Following website currently shows many more than 100 aircraft available for firefighting spread throughout the most fire-prone parts of the United States. Exhibit 1.

(c). Aircraft are assigned and controlled by the NICC, and when a new fire breaks out, or if one fire grows and requires additional assets, the NICC has the capability to get aircraft released from one fire and reassigned to another. The USFS definitely has the mechanism in place to move assets from one incident to another, and the USFS can do this in conjunction with the incident commander at each location. Thus, while the statement in Para. 12(b) of the findings and determination document is true to a point, *i.e.*, current CWN helicopters "are under the control of the incident commander for specific needs of that incident, and are generally not available to meet a strategic objective supporting more that one incident," the fact is that it is only true until NICC decides, as they frequently have, that they have a bigger problem somewhere else. When that happens, they ask the incident commander to release the helicopters from his fire and they are immediately reassigned to a larger strategic objective. This happens regularly under the existing system.

(d). I am very concerned about some statistics cited by the USFS in Para. 12(b) of the findings and determination document. They say, "At the beginning of the 2006 season, there were over 241 helicopters under CWN contracts with the Forest Service for interagency use; only about 40% of them were available for firefighting use and the actual numbers fluctuated." This could give a reader the wrong impression of the true situation. First, 40 percent of 241 helicopters would give the USFS 96 helicopters, far in excess of what will be available under the contracts that are about to begin if the stay is lifted. Second, I am not surprised that only 40 percent were available "at the beginning of the 2006 season" since many operators bring aircraft off of other contracts or wrap-up other commitments in order to become available for firefighting, and this normally occurs in the early part of the summer. In other words, the USFS statistic reflects the *early* part of the summer of 2006. The only fluctuation that I am aware of is that that number dramatically increased so that, by early July, 75 percent of the fleet was probably available. The USFS's own practices acknowledge this fact of life: Most of the USFS's Exclusive Use contracts under the disputed solicitation do not begin until after June 15, with several starting in July.

(e). The USFS often puts CWN aircraft on "severity" status, *i.e.*, when there is a very high fire danger in a particular area or they are expecting dry lightning or other things that start fires. The USFS simply assigns CWN aircraft to strategic locations near that area on a paid CWN daily rate on standby and ready to fly for initial attack. When the danger has passed the USFS releases the helicopter from the severity contract or moves it to another location. Based

on our experience with the USFS, I believe this is exactly what it will do with the Exclusive Use aircraft if the stay is lifted, but the fact is that the USFS has that mechanism in place now, and has implemented it in several CWN contracts throughout the west.

9. In Paragraph 14 of the USFS's findings and determination document, the point is made that if performance is not continued, "the Forest Service and its interagency partners will not have 35 medium and heavy helicopters available for their exclusive use for initial attack and large fire support, that have been inspected, approved for use, and stationed at designated locations with pilots and crews ready to deploy at a moment's notice." As I have indicated above, through voluntary pre-positioning, CWN severity standby arrangements, and the sheer numbers of available CWN aircraft, the USFS has as many or more aircraft available as it would under the challenged Exclusive Use contracts. In addition, every single CWN helicopter was inspected and approved for use by the USFS prior to the beginning of this fire season, under precisely the same process used to inspect Exclusive Use aircraft.

10. I understand that the USFS might prefer to use its "exclusive use contracts" first, and then resort to using its CWN contracts only when the exclusive use contracts are not sufficient to deal with the fires it is fighting.

11. In my experience, our response time under our CWN contracts is consistently as good as the response time under Exclusive Use contracts. As an example, the USFS called us on the afternoon of Saturday, June 30, and asked us to send a helicopter we had in Albuquerque, New Mexico, to a fire in Utah. Our pilot and helicopter arrived at the site on Sunday morning, before the USFS manager arrived. This is a frequent occurrence under our CWN contracts.

12. There are 35 line items in the solicitation, more than half of which have 90-day periods of performance. The other line items have periods of performance of 150 and 180 days. As I understand it, the Government Accountability Office has 100 days to decide the protest that we filed there on Friday, June 29, 2007. Thus, even if our protest is sustained, if the stay is lifted the contract line items that we are seeking will have been performed, either fully or halfway, and this important contracting opportunity will have been lost forever. In addition to losing out under this solicitation, where we believe we should have been awarded one contract, the USFS will move quickly to replace the RHI helicopters currently working on a CWN contract. This will only add to our financial harm.

13. In the last two years, 85 percent of RHI's annual revenues have come from USFS contracts. In addition, RHI has invested over $400,000 in recent years to develop a firetank exclusively for use on USFS fires, and we routinely spend additional funds on an annual basis to ensure that our equipment remains compliant with the ever-changing technical specifications imposed by the USFS. The loss of this contracting opportunity would deal a severe blow to RHI, not just in the lost revenues for the next year but in rendering it nearly impossible for RHI to recover the costs we have invested in our special firefighting equipment.

And Further Affiant Saith Not.

[signature]

Richard L. Larew

STATE OF WASHINGTON )
)
CITY/COUNTY OF King )

Subscribed and sworn to before me this 10th day of July, 2007.

Linda L. Christensen
Notary Public
State Of Washington
Commission Expires 10/01/2010

Linda L. Christensen

Notary Public

My Commission Expires: 10/01/2010

# EXHIBIT 1


Legends
Resource Legend
Flag Background Colors
Resource At Base
Active Resource
Inactive Resource
Lost Contact
Current Resource
Java Applet Window