IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUPERIOR HELICOPTER LLC, and RAINIER HELI-LIFT, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | **BID PROTEST**<br>Court Nos. 07-518C, 07-519C<br>(Judge Lettow) |
| ERICKSON AIR-CRANE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

JOHN J. TODOR
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St., N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel.: (202) 616-2382
Fax: (202) 514-8640
Attorneys for Defendant

OF COUNSEL:
ELIN M. DUGAN
U.S. Department of Agriculture
Office of General Counsel
1400 Independence Avenue
Mail Stop 1415
Washington, D.C. 20250

July 12, 2007

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES . . . . . ii

DEFENDANT'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER . . . . . 1

STATEMENT OF THE ISSUES . . . . . 1

STATEMENT OF FACTS . . . . . 2

ARGUMENT . . . . . 4

I. Standard Of Review . . . . . 4

A. Substantive "Arbitrary And Capricious" Standard . . . . . 4

B. Standard For Preliminary Injunctive Relief . . . . . 5

II. Plaintiffs' Request For A Temporary Restraining Order Should Be Denied . . . . . 7

A. USFS's Determination and Findings Are Rational, And, Therefore, Plaintiffs Have Not Demonstrated A Likelihood Of Success On The Merits . . . . . 8

1. USFS Properly Concluded That The Benefits Of The Override Outweighed The Costs And Risks Of The Status Quo . . . . . 9

2. USFS Rationally Found That Existing Contractual Arrangements Were Not A Reasonable Alternative . . . . . 10

3. USFS Properly Considered The Possible Consequences Of A Reversal At GAO . . . . . 14

B. The Balance Of Harms Compels The Denial Of Injunctive Relief . . . . . 15

1. No Irreparable Harm To Plaintiffs Would Result From Denying Injunctive Relief . . . . . 15

2. The Harm To The United States Equals Or Outweighs The Harm To Plaintiffs . . . . . 17

C. Denying Injunctive Relief Is In The Public Interest . . . . . 20

CONCLUSION . . . . . 21

## TABLE OF AUTHORITIES

**FEDERAL CASES:**

Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054( Fed. Cir. 2000) . . . . . . . . . . . . . 5

Alion Science & Tech. Corp. v. United States, 69 Fed. Cl. 14 (2005) . . . . . . . . . . . . . . . 8, 12, 13

Automation Technologies, Inc. v. United States, 72 Fed. Cl. 723 (2006) . . . . . . . . . . . . . . . . . . 14

Bannum, Inc. v. United States, 60 Fed. Cl. 718 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303 (2000) . . . . . . . . . . . . . . . . . . . . . . . 6

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281 (1974) . . . . . . . . . . . . . . . 5, 7

CACI, Inc. v. United States, 719 F.2d 1567 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Camp v. Pitts, 411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CCL Serv. Corp. v. United States, 48 Fed. Cl. 113 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464 (2004) . . . . . . . . . . . . . . . . . . . . . . . 5

Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188 (2005) . . . . . . . . . . . . . . . . . . passim

Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 5

Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371 (2004) . . . . . . . . . . . . . . . . . . . . . 10

FMC Corp. v. United States, 3 F.3d 424 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) 6

JWK Int'l Corp. v. United States, 52 Fed. Cl. 650 (2002), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753 (2004) . . . . . . . . . . . . . . . . . . . . . . . 16

Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99 (2003) . . . . . . . . . . . . . . . . . . . . . . . 15

PGBA, LLC v. United States, 57 Fed. Cl. 655 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999) . . . . . . . . . . 4, 5

Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006) . . . . . . . . . . . . . . . . . . . . 12

San Diego Beverage & Kup v. United States, 997 F. Supp. 1343 (S.D. Cal. 1998) . . . . . . . . . . 15

Saratoga Dev. Corp. v. United States, 21 F.3d 445 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 6

Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573 (2003) . . . . . . . . . . . . . . 17

Spherix, Inc. v. United States, 62 Fed. Cl. 497 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

**FEDERAL STATUTES AND REGULATIONS:**

31 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 U.S.C. § 3553(c)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 U.S.C. § 3553(d)(3)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 U.S.C. § 3553(d)(3)(C)(i)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

48 C.F.R. § 33.104(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SUPERIOR HELICOPTER LLC, and<br>RAINIER HELI-LIFT, INC.,<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 07-518C<br>(Judge Lettow) |
| ERICKSON AIR-CRANE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 07-519C<br>(Judge Lettow) |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' APPLICATIONS FOR A TEMPORARY RESTRAINING ORDER**

Pursuant to Rule 65 of the Rules of the Court of Federal Claims and the Court's July 11, 2007 order, defendant, the United States, respectfully submits the following brief in opposition to the applications for a temporary restraining order filed by plaintiffs, Superior Helicopter LLC ("Superior"), Rainier Heli-Lift, Inc. ("Rainier") and Erickson Air-Crane, Inc. ("Erickson").[1]

**STATEMENT OF THE ISSUES**

1. Whether the findings to override the automatic stay ("Findings") of the U.S. Forest Service ("USFS" or "agency"), dated July 9, 2007, which concluded that it is in the best

---

[1] Superior and Rainier filed their case separately from Erickson, and the cases have not been consolidated as of this time. Nevertheless, due to the short time frame, and for the convenience of the court, we have filed this response to both sets of parties' motions in advance of the Court's hearing on the applications for a temporary restraining order.

interests of the United States to continue with contract performance due to urgent and compelling circumstances, are arbitrary, capricious, an abuse of discretion, or otherwise unlawful.

2. Whether the Court should preliminarily enjoin USFS from continuing performance of the contracts pending the GAO's decision in the absence of a showing of irreparable harm to plaintiffs and the balance of harms correspondingly favoring the Government.

## STATEMENT OF FACTS[2]

USFS, a component of the United States Department of Agriculture, issued a Request for Proposals ("RFP"), AG-024B-S-07-0008, for 35 contract line items for helicopter services on April 6, 2007. See Findings ¶ 1 (attached to Erickson's Mem. in Support of Mot. for TRO ("Erickson Mem.") at Ex. 1). Offers were received by the close of business on May 10, 2007. A formal pre-proposal conference was conducted on April 18, 2007, discussing in depth the requirement of the solicitation. On June 13, 2007, USFS notified 18 vendors that they were awarded contracts for 35 bases. On June 13 and 14, 2007, USFS notified unsuccessful offerors that awards would not be made to them. Findings ¶ 2.

Erickson, Superior and Rainier submitted proposals. USFS evaluated the proposals, but none of them was selected for the contract line items. Findings ¶¶ 3-5. All three are currently under contract with USFS, along with other vendors, to provide helicopter services on a "call-when-needed" ("CWN") basis, however. See Erickson Mem. at 7-8; Superior and Rainier's Mem. in Support of TRO ("Superior Mem.") at 6.

---

[2] Because the administrative record has not yet been filed in this action, we reserve the right to supplement our discussion of the facts in our brief upon the merits of plaintiffs' complaints.

Erickson filed a bid protest with the Government Accountability Office ("GAO") on June 22, 2007 (B299909.1). Findings ¶ 3. Pursuant to 31 U.S.C. § 3553(d)(3)(A), an automatic stay of the awards went into effect. Superior and Rainier filed bid protests with the GAO on June 29, 2007 (B299909.2 and B299909.3). Findings ¶¶ 4-5.

USFS exercised its authority pursuant to 31 U.S.C. § 3553(d)(3)(C) to override the stay of the awards. In its determination and findings dated July 9, 2007, USFS found that:

> It is critical that performance under the awarded contracts, specifically 34 of the 35 total contract line items contained in the solicitation, continue in the face of a protest. (Item 9 of the solicitation is specifically excluded from the protests.) The national helicopters are critical aviation resources needed for support of national fire suppression efforts, specifically initial attack and large fire support. These 35 helicopters are contracted for the exclusive use of the Forest Service and its National Wildfire Coordinating Group partners in the Department of Interior and the National Association of State Foresters. These helicopters are part of a national contingent of resources and are moved wherever needed on federal and state jurisdictional fires.

Findings ¶ 8.

USFS differentiated the "exclusive use" contracts under the current solicitation from the pool of "call-when-needed" helicopters that includes plaintiffs' helicopters:

> Under exclusive use contracts, such as the one that is the subject of the protests, the contractor is obligated to provide and station a helicopter and crew during mandatory availability periods as defined in the contract. . . . In contrast, helicopters under Call-When-Needed (CWN) contracts may be ordered by the Government if a specific need for them exists; however, the contractor is not obligated to accept those orders and, often, they do not, because the helicopter is not available due to other commitments the contractor might have. There is no availability rate paid or other guarantee that the Government will order that helicopter, and no requirement for the contractor to accept any orders under CWN contracts.

Findings ¶¶ 9-10.

Pursuant to these findings, among others, USFS determined that there were urgent and compelling circumstances, and that it was in the Government's best interests to override the stay and place an orders for services from the awardees:

> If performance is not continued, the Forest Service and its interagency partners (including states) will not have 35 medium and heavy helicopters available for their exclusive use for initial attack and large fire support, that have been inspected, approved for use, and stationed at designated locations with pilots and crews ready to deploy at a moment's notice. While some of these helicopters might be available under the call-when-needed contracts, there is no guarantee that enough of them will be available and in a state of readiness to deploy at a moment's notice when they are most urgently needed.

Findings ¶¶ 14.

The GAO's decision is due on October 1, 2007. Plaintiffs filed suit in this Court on July 11, 2007.

## ARGUMENT

## I. Standard Of Review

### A. Substantive "Arbitrary And Capricious" Standard

In a procurement-related challenge, the Court assesses the agency's decision pursuant to the review standard of the Administrative Procedure Act, 5 U.S.C. § 706(2), as incorporated by the Tucker Act, 28 U.S.C. § 1491(b)(4). RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1291 (Fed. Cir. 1999). Thus, plaintiffs must "prov[e] that the override decision here was arbitrary and capricious." PGBA, LLC v. United States, 57 Fed. Cl. 655, 660 (2003).

Application of the arbitrary and capricious standard involves neither judicial fact finding, nor review of the agency's factual statements for "substantial evidence." See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411 U.S. 138, 140 (1973)). Rather, the Court will sustain an agency decision "evincing rational reasoning and consideration of relevant factors." Id. at 1058 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)). The Court should ask whether there has been "a clear error of judgment," without substituting its own judgment for that of the agency. E.g., Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004). Consequently, in the context of this action, the Court should simply assess whether the written determination and finding of the USFS supplies "a rational basis" for the agency's determination to continue contract performance. Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 466 (2004).

### B. Standard For Preliminary Injunctive Relief

Injunctive relief for a disappointed bidder is appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting CACI, Inc. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). In order to obtain a preliminary injunction, a plaintiff must carry the burden of establishing entitlement to this extraordinary relief by clear and convincing evidence based upon the following factors: (1) a likelihood of success on the merits; (2) that the plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to the plaintiff will outweigh the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000); PGBA, 57 Fed. Cl. at

657. But see Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004) (applying a preponderance of the evidence standard).

The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). "[I]n the context of the review of an agency's best interests determination under the APA standard, even if the court were to find that [the agency's] actions were arbitrary and capricious, it still examines the other factors of the preliminary injunction analysis to determine whether a preliminary injunction should issue." Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 192 n.2 (2005) (citing FMC, 3 F.3d at 427).

In evaluating whether an agency official's actions were rational, the "'disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). Courts have recognized that contracting officials may properly exercise wide discretion in applying procurement regulations. See id. at 1332; Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985).

The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which consider[s] the relevant factors and is within the bounds of reasoned decisionmaking." JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n. 8 (2002), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003) (quotation omitted). In this regard, the Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions.

Bowman, 419 U.S. at 285-86 (1974). Therefore, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be sustained.

## II. Plaintiffs' Request For A Temporary Restraining Order Should Be Denied

Pursuant to 31 U.S.C. § 3553(d)(3)(C), an agency may override the automatic stay upon a written finding that:

> [P]erformance of the contract is in the best interests of the United States; or urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(I); see also 48 C.F.R. § 33.104(c)(2). In this case, USFS overrode the stay pursuant to both the "urgent and compelling circumstances" and "best interests" provisions of the statute. Findings ¶ 15.

The Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553, grants an agency significant discretion in choosing to override an automatic stay. Indeed, by enacting section 3553(d)(3)(C), Congress granted agencies even greater discretion in overriding automatic stays in the post-award context than in the pre-award context. Pursuant to 31 U.S.C. § 3553(c)(2), an automatic stay entered prior to contract award may be overridden only "upon a writing finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General." 31 U.S.C. § 3553(c)(2)(A). In post-award actions, by contrast, an agency has the additional option of overriding an automatic stay upon the more subjective finding that "performance of the contract is in the best interests of the United States." 31 U.S.C. § 3553(d)(3)(C)(i)(I). Post-award, a finding of "urgent and compelling circumstances" is not required. Id. In granting agencies the additional option of

overriding an automatic stay when it is in the best interests of the United States, Congress recognized that the circumstances requiring an override may vary widely, and it granted agencies substantial discretion in making that determination.

Although a finding pursuant to either provision allows an agency to override an automatic stay, the standard of review for a "best interests" determination differs from that of an "urgent and compelling circumstances" determination. This Court has also recognized that the "best interests" exception may provide agency officials with "a lower standard for overriding a stay," although situations in which the Government's "best interests" would not involve "urgent and compelling" circumstances may be unusual. Alion Science & Tech. Corp. v. United States, 69 Fed. Cl. 14, 17 (2005) (quoting Spherix, Inc. v. United States, 62 Fed. Cl. 497, 505, 507 (2004)).

### A. USFS's Determination And Findings Are Rational, And, Therefore, Plaintiffs Have Not Demonstrated A Likelihood Of Success Upon The Merits

An agency's decision may be arbitrary and capricious where the agency: (1) "has relied on factors which Congress has not intended it to consider;" (2) "entirely failed to consider an important aspect of the problem;" (3) "offered an explanation for its decision that runs counter to the evidence before the agency;" or (4) if the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983). Those flaws are absent from the written finding under review. Plaintiffs bear the burden to demonstrate error in the written determination and finding. PGBA, 57 Fed. Cl. at 660.

**1. USFS Reasonably Concluded That The Benefits Of The Override Outweighed The Costs And Risks Of The Status Quo**

USFS explained the bases for its decision in its decision memorandum of July 9, 2007, signed with the authority of Chief of the Forest Service. It weighed the competing factors of public safety, potential for delay, cost and potential ramifications of the protests being sustained by GAO, and concluded that the override was in the best interest of the United States. This court has previously found that public safety is an appropriate justification for an override, particularly where, as here, the agency finds an increased risk of adequate services not being performed during the protest period. See Chapman, 67 Fed. Cl. at 194-95 ("public safety" concern of "risk" and "possibility" that buildings will not be properly managed during override period sufficient to sustain override). USFS made such a finding here, based upon its experience in terms of firefighting needs and helicopter availability, primarily due to the risk of services not being adequately performed during the protest period due to the limited availability of helicopters. Such a finding satisfies the requirements of CICA and is neither arbitrary nor capricious.

Plaintiffs also claim that USFS erred in not quantifying the expected costs and benefits from the override decision more explicitly than it did. Erickson Mem. at 7 ("failed to quantify the costs of proceeding with an override and any supposed benefits"), 12-13 ("reasonable attempt to determine the weight of each"); Superior Mem. at 8-9 (discussing comparison of costs with helicopter availability). But such a calculation can not be performed with mathematical precision in the case of firefighting needs that are dependent upon the amount of fire activity and are thus, by their nature, difficult to predict with certainty. The factors considered by USFS, such as the number of helicopters available for a given fire, the time needed to obtain a helicopter for a given

fire, or the total cost of firefighting activity, all depend on the amount of fire activity. Such calculations are, by their nature, projections. Although plaintiffs may disagree with USFS's projections, this does not constitute a failure on the part of USFS to weigh the facts before it in making its determination.

### 2. USFS Rationally Found That Existing Contractual Arrangements Were Not A Reasonable Alternative

Plaintiffs argue that USFS could achieve the same level of services during the stay period by either utilizing the CWN contracts or extending previously expired exclusive use contracts. Erickson Mem. at 10; Superior Mem. at 6-7 ("USFS may obtain helicopter firefighting services, when and where needed, under the existing CWN contracts . . . ."). To the contrary, USFS found that these alternatives were inadequate.[3] USFS considered alternatives to the override and concluded that the override was the most feasible alternative to maintain the required services during the protest period. See Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 381 (2004) (noting that the urgency justification cannot support more than the minimum quantity and time needed to satisfy immediate urgent requirements).

As support for its decision, USFS found the current national supply of exclusive use Type I helicopters was inadequate because only four were under exclusive use contracts prior to the

[3] Plaintiffs concede that CWN contractors are not obligated to provide the number of helicopters USFS requires. See Superior Mem. at 7 ("Although the CWN contractors are not required to dedicate their helicopters solely to service the USFS's requirements – as is the case under USFS exclusive use contracts – and the CWN contractors may decline a USFS order for a helicopter that is being used for other purposes, the USFS's mission has not been jeopardized by delays or lag time in deploying aircraft for firefighting purposes due to the nature of the CWN contracts and their location in all the areas of high risk of fire."); Erickson Mem. at Ex. 2, ¶ 10 ("In accepting the order, the contractor agrees to make the helicopter available for a mutually agreeable period of time or until the Forest Service releases the helicopter.") (emphasis added). See also Findings ¶ 10.

current contract. Findings ¶ 12(a). USFS also found that helicopters were a superior alternative to fixed-wing aircraft in terms of "accuracy in delivery of water and retardant drops as well as the equipment delivery that these helicopters provide, can't land at other than airports, and can generally only be used for a single purpose." Findings ¶ 12(d).

With respect to CWN helicopters, including plaintiffs', USFS found that the current contractual arrangements present a risk of either helicopters not being available, or of there being a time lag in obtaining the helicopters for a fire that is located far from where the nearest available helicopter is based:

> b) Substitution of CWN contracts for the exclusive use contract: The contingent of helicopters under current CWN contracts has been depleted, with vendors committing to work in the private sector and not having helicopters for guaranteed use by the Forest Service and its partners in firefighting efforts. In addition, these helicopters when ordered are funded by and directly support a single incident, and cannot be easily moved to different assignments as they are under the control of the incident commander for specific needs of that incident, and generally not available to meet a strategic objective supporting more than one incident. At the beginning of the 2006 season, there were over 241 helicopters under CWN contracts with the Forest Service for interagency use; only about 40% of them were available for firefighting use and the actual numbers fluctuated. The FS determined it was advantageous to offer a larger number of exclusive use contracts in 2007 to guarantee a consistent availability throughout the season at a lower cost than the typical CWN resource and to manage them strategically.

Findings ¶ 12(b) (emphasis added).[4]

---

[4] Plaintiffs attempt to dispute these factual findings by producing affidavits from their executives and a printout of data from USFS's website. Erickson Mem. at Ex. 2; Superior Compl., Attachments 1 and 2. Whatever relevance these statements may have to the Court's findings with respect to irreparable harm to plaintiffs, such submissions are not appropriate for deciding the merits of USFS's decision. Although the administrative record has not yet been compiled, such submissions run counter to the structure of this Court's bid protest jurisdiction,

USFS also considered the alternative of bridge or interim contracts, but concluded that this would be impractical because the pool of potential awardees would be the same as the actual awardees due to the other proposals having been eliminated for technical reasons. "Although the Forest Service believes that other than full and open competition would be justified under the circumstances, it would have the same effect as the stay override and is, therefore, not actually an 'alternative' to the override." Findings ¶ 12 (c). USFS properly concluded that such a procedure would not "accomplish the goals of CICA with respect to the automatic stay." Id.; see also Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715 (2006) (holding that when "in a process that reflected no new competition, [agency] was awarding the interim contract to the same contractor to whom the challenged contract had been awarded," agency override was arbitrary and capricious).

Erickson also argues that it would be amenable to extending an exclusive use contract it had with USFS, which expired upon award of the new contracts. Erickson Mem. at 10; see also Findings ¶ 12(a). Erickson also alleges that other contractors also had exclusive use contracts with USFS that were ended by the entry of the new contracts, and that it expects "on information and belief" that the other contractors would be willing to extend their exclusive use arrangements as well. Id. Such claims are speculative, however, particularly in the case of contractors who are not parties to the suit. Not only would the number of contractors be in doubt, but so would the

---

which is a record review. When the Court decides the merits of plaintiffs' claims for relief, rather than seeking to contradict the findings in the determination with the statements of its own executives, plaintiffs are required to point to evidence within the administrative record to support their position, or seek to supplement the record through proper motion to the Court. See Alion, 69 Fed. Cl. at 31 ("Therefore, plaintiff was required to articulate the foundation for its arguments *based on the administrative record* or, if no support could be found for its arguments, *appropriately supplement the record with supporting documents.*") (emphasis in original).

number of helicopters available, particularly given that Erickson has only protested 18 of the 35 contracts.

USFS found that only four Type I helicopters were currently under exclusive use contracts, presumably including Erickson's, although technically even these exclusive use contracts expired with the issuance of the new exclusive use contracts. Findings ¶ 12(a). Moreover, USFS concluded that many contractors whose bids for the new contracts were rejected, including Erickson, were rejected because their bids were technically inadequate. Findings ¶ 12 (c). USFS would thus be presented with an "alternative" of using contractors whose bids were found to be technically inadequate for the new contract. Erickson's claim that USFS "could meet its needs" through a mixture of old contracts during the stay period, Erickson Mem. at 10, is simply speculative.

All of these findings show that USFS rationally considered the relevant factors and weighed them in making its decision. In doing so, USFS properly exercised its discretion in finding that it could not obtain the desired level of performance during the protest period without the override. See, e.g., Alion, 69 Fed. Cl. at 29 (finding that override was rational based in part on finding that agency had originally tried to obtain a level of service required by its changing mission requirements from its existing contractors, including plaintiff); Chapman, 67 Fed. Cl. at 194-95 ("risk" of disruption of services supported override); Spherix, 62 Fed. Cl. at 506 (disruption to program for busiest season supported override). Plaintiffs therefore can not demonstrate a likelihood of success upon the merits.

### 3. USFS Reasonably Considered The Possible Consequences Of A Reversal At GAO

USFS also considered the potential impact of a reversal at GAO. "[T]he significant risks that would result from not overriding the stay – *i.e.*, the inability to guarantee helicopter availability and therefore to prevent loss of life and property – outweigh the ramifications of any sustained bid protests." Findings ¶ 13. This differentiates this case from other cases before this Court where the Court found that an agency did not properly consider the consequences of having the GAO override overturned by this Court. See, e.g., Automation Technologies, Inc. v. United States, 72 Fed. Cl. 723, 730 (2006) (citing failure to consider "ramifications of an agency loss in the GAO protest").

Plaintiffs also argue that USFS did not properly quantify the cost-benefit analysis involved in the possibility of a reversal at GAO in making its override determination. See Erickson Mem. at 7; Superior Mem. at 8-9. Again, such an argument is inappropriate because the costs and benefits are dependent upon the amount of fire activity and many other variables that can not be known in advance. Although USFS exercised its discretion in weighing the information based upon the information available to it, the quantification demanded by plaintiffs is neither feasible nor reasonable. Moreover, USFS weighed the potential costs of a reversal at GAO against the possible loss in firefighting effectiveness, so a financial analysis, however detailed, would be inapt. See Findings ¶ 13; compare Automation Technologies, 72 Fed. Cl. at 730 (difference in cost as opposed to effectiveness).

### B. The Balance Of Harms Compels The Denial Of Injunctive Relief

Not only are the merits of plaintiffs' challenge to USFS's "best interests" determination weak, the balance of harms also warrants a denial of preliminary injunctive relief. Indeed, no irreparable harm to plaintiffs would flow from a denial of injunctive relief, whereas the harm to United States from an injunction would be substantial and virtually immediate. The Court should, therefore, deny plaintiffs' request for a temporary restraining order. PGBA, 57 Fed. Cl. at 657; Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 109 (2003) (listing equitable factors and noting "[c]ourts interfere with the government's procurement process only in extremely limited circumstances").

#### 1. No Irreparable Harm To Plaintiffs Would Result From Denying Injunctive Relief

Plaintiffs fail to establish that they would suffer any irreparable injury from a denial of preliminary injunctive relief. Plaintiffs' main argument is simply that they will be deprived of the exclusive use contracts they would like to perform. "Normally, an injury is not considered 'irreparable' if the only injury alleged is monetary loss." Chapman, 67 Fed. Cl. 188 (2005) (sustaining override). Loss of business is not irreparable harm. "In every procurement award there are generally more losers than winners. To find that a losing procurement participant suffers irreparable harm merely because it did not succeed with its contract proposal would create in the losing party an automatic right to injunctive relief." San Diego Beverage & Kup v. United States, 997 F. Supp. 1343, 1347 (S.D. Cal. 1998).

Plaintiffs also argue that they will be irreparably harmed by potentially losing business under the CWN contracts they currently have with USFS. However, USFS has also found that,

"[a]t the beginning of the 2006 season, there were over 241 helicopters under CWN contracts with the Forest Service for interagency use; only about 40% of them were available for firefighting use and the actual numbers fluctuated." Findings ¶ 12(b). This illustrates the speculative nature of plaintiffs' claim for irreparable harm in several ways. First, even if USFS were to use a greater number of CWN helicopters in the absence of the stay, there is no guarantee that plaintiffs' helicopters would be the ones used from the pool of 241 helicopters. Second, it is still possible for USFS to utilize plaintiffs' helicopters under the existing CWN contracts even if it also has exclusive use helicopters under contract. Third, given that only about 40 percent of the CWN helicopters were available for use by USFS in 2006 because they were under contract to other agencies or private entities, there is a significant chance that plaintiffs' helicopters would be used by an entity other than USFS in 2007 as well. Thus, plaintiffs' claims of irreparable harm are speculative, unlike cases involving an incumbent contractor that was performing the bulk of the contract during the protest period. See PGBA, 57 Fed. Cl. at 664 ("advantages associated with its incumbency"); Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753, 756 (2004) ("Keeton could continue to perform during the protest period").

Plaintiffs also raise loss of an "opportunity to compete" as a factor supporting irreparable harm. Superior Mem. at 11; see also Erickson Mem. at 16-17. Such a concern is misplaced here, however. Plaintiffs' eligibility for recompetition would not be affected by operation of the exclusive use contracts during the protest period. Even if plaintiffs prevail before the GAO, the GAO and USFS would omit any advantages gained by the awardees during the bid protest period from any reevaluation of the bids. 31 U.S.C. § 3554(b)(2) ("If the head of the procuring activity responsible for a contract makes a finding under section 3553(d)(3)(C)(i)(I) of this title, the

Comptroller General shall make recommendations under this subsection without regard to any cost or disruption from terminating, recompeting, or reawarding the contract."). See Sierra Military Health Services, 58 Fed. Cl. 573, 583 (2003) (Court favorably cited 31 U.S.C. § 3554(b) in finding no irreparable harm).

Plaintiffs also raise the potential of lost business under the new, exclusive use contract as a possible loss to them during the GAO protest period. See Superior Mem. at 11 (citing loss of opportunity "to secure the resulting profit from those contracts that Superior and Rainier would have received but for the Agency's improper rejection of their proposals"); Erickson Mem. at 16-17 ("If the override were to be sustained, Erickson's eventual victory before GAO will be a hollow one."). Plaintiffs, however, would not have received any work under the new exclusive use contracts during the protest period in any event; either USFS would override and use the new contracts, or it would allow the stay to remain in place and no one would receive work under the new contracts. It is also not guaranteed whether, or how many, contracts plaintiffs would receive were they to prevail at GAO; indeed, they would be competing with each other for many of the same contracts if they all prevailed at GAO. Any benefits to plaintiffs should they prevail at GAO are not relevant to the Court's analysis of the override decision.

### 2. The Harm To The United States Equals Or Outweighs The Harm To Plaintiffs

The harm to the Government equals or outweighs any potential harm to plaintiffs because the operation of the automatic stay will serve to deprive USFS of most or all of the services on the exclusive use contracts. The exclusive use contracts are scheduled to last until March 31, 2008, with mandatory availability periods last between 90 and 180 days, depending on the contract.

Because the GAO protest period lasts 100 days (through October 1 for Erickson's protest and October 9 for Superior's and Rainier's), the automatic stay would essentially eliminate most or all of the mandatory availability period. Thus, USFS's override will not impair plaintiffs' post-protest ability to receive an award because, in most cases, there would be no mandatory availability period for exclusive-use contracts for 2007 absent an override of the stay.

Some of the contracts call for renewal by the agency for the next year's fire season. Even if the GAO were to find in favor of plaintiffs at the conclusion of the protest period, however, the balance of harms would still favor the Government. If GAO found in favor of plaintiffs, USFS would then presumably be required to recompete the contracts after the protest period, but this would not enable plaintiffs to obtain the exclusive use contracts for this fire season, which will have ended in most cases by October 1, 2007. If USFS were to prevail, on the other hand, the exclusive use contracts would simply be in position to be renewed for the next fire season. Plaintiffs will not gain during this fire season, but the Government would be harmed.

Moreover, when balancing the respective harms that can flow from the grant of, or failure to grant, an injunction, the Court may take into account not only the potential harm to the plaintiff and to the government, but also potential harm to third parties. Chapman, 67 Fed. Cl. at 193 (citing PGBA, 389 F.3d at 1230). In PGBA, the Federal Circuit upheld the trial court's denial of an injunction, after finding that any injunctive remedy would create administrative and financial burdens for the Government, as well as possibly create risks for third parties.

USFS considered these risks, including the risks to third parties from fire potential, in making its determinations. Moreover, the months of the stay – July, August and September – are

also summer months with higher temperatures. USFS cited its weather forecasts as of the time of the override in making its findings:

> Significant fire potential in July is expected to be higher than normal over much of the West, western Great Lakes, the Ohio River and Tennessee Valleys, the central and southern Appalachians, and localized portions of southern Alaska. Fire potential in the West is expected to spread northward in August. Dryness of fuels in many western states is setting historic maximums. This will contribute to fire ignitions and spread from lightning and human sources.

Findings ¶ 11. Given USFS's finding of increased fire potential, the potential harm to the United States, as well as to third parties, outweighs any potential harm to plaintiffs.

The operation of the stay also creates financial risk for USFS. If the stay is reinstated, USFS will be forced to proceed under the current CWN contracts, which may involve greater cost than the exclusive use contracts depending upon the extent of need for the helicopter services, until the conclusion of the GAO proceeding. USFS found in its decision memorandum that the exclusive use contracts would "guarantee a consistent availability throughout the season at a lower cost than the typical CWN resource," and would also enable USFS to "manage them strategically." Findings ¶ 12(b). Plaintiffs, on the other hand, stand only to lose the opportunity for potential greater use under the CWN contracts, or, in the case of Erickson, theoretical extension and additional use under its expired exclusive use contract for a smaller number of helicopters. Like the risk of loss of services, the financial harm to the Government equals or outweighs the harm to plaintiffs.

Erickson argues that allowing an agency to override the stay for a short-duration contract such as this one would allow the agency to "have its decisions be effectively unreviewable." Erickson Mem. at 18. This is not the proper question. Rather, the question is whether USFS

should be barred by the automatic stay from being able to issue contracts for the fire season if a disappointed bidder files a protest with the GAO. In the absence of an override, plaintiffs will be able to cause the contract for the current season to be "rendered a nullity," Erickson Mem. at 18, even if the GAO sustains USFS's decision. The balance of harms thus favors the Government.

### C. Denying Injunctive Relief Is In The Public Interest

USFS's primary basis for the override is its finding that having the helicopters available for exclusive use would increase public safety by having a guaranteed source of helicopters available for a national fire strategy. Such a determination is within the public interest, and is within the USFS's core responsibility for coordinating the national fire effort. USFS has thus determined that the override is in the public interest. This Court has previously found that public safety is an appropriate justification for an override, particularly where, as here, the agency finds an increased risk of adequate services not being performed during the protest period. See Chapman, 67 Fed. Cl. at 194-95 ("public safety" concern of "risk" and "possibility" that buildings will not be properly managed during override period sufficient to sustain override).

Plaintiffs' primary response to USFS's finding is their claim that USFS would still have access to the same helicopter services as it obtained under the new contracts by use of the existing CWN contracts rather than the new exclusive use contracts. This argument, however, does not comport with USFS's assessment of the risks inherent in relying upon the CWN contracts. USFS found in its decision memorandum that for exclusive use contracts, "the contractor is obligated to provide and station a helicopter and crew during mandatory availability periods as defined in the contract," while for CWN contracts, "the contractor is not obligated to accept those orders and, often, they do not, because the helicopter is not available due to other commitments the contractor

might have." Findings ¶¶ 9, 10. Furthermore, USFS found that the CWN contracts present a risk of either helicopters not being available, or of there being a time lag in obtaining the helicopters for a fire that is located far from where the nearest available helicopter is based. Findings ¶ 10.

Plaintiffs' claims that overriding the stay would affect public confidence in the integrity of the procurement process are unfounded. To be sure, preserving competition is one of the main purposes of the CICA stay, and it would affect public confidence if stays could be arbitrarily or capriciously overridden. However, there is no suggestion here that the agency has attempted to break or evade the rules of competitive contracting. Plaintiffs' arguments before the GAO are technical in nature, relating to information that was not provided in the bidder's proposal (for Erickson) or for not providing the correct flight manual charts specified in the solicitation, for purposes of determining aircraft performance (for Superior and Rainier). Therefore, any claim that an override would undermine faith in the procurement system is unfounded.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' requests for a temporary restraining order.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ John J. Todor
JOHN J. TODOR
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St., N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel.: (202) 616-2382
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
ELIN M. DUGAN
U.S. Department of Agriculture
Office of General Counsel
1400 Independence Avenue
Mail Stop 1415
Washington, D.C. 20250

July 12, 2007

**CERTIFICATE OF FILING**

I hereby certify that on July 12, 2007, a copy of foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/John J. Todor