**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SUPERIOR HELICOPTER LLC, and RAINIER HELI-LIFT, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | **BID PROTEST** Court Nos. 07-518C, 07-519C (Judge Lettow) |
| ERICKSON AIR-CRANE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTIONS**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

JOHN J. TODOR
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St., N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel.: (202) 616-2382
Fax: (202) 514-8640
Attorneys for Defendant

OF COUNSEL:
ELIN M. DUGAN
U.S. Department of Agriculture
Office of General Counsel
1400 Independence Avenue
Mail Stop 1415
Washington, D.C. 20250

August 2, 2007

# TABLE OF CONTENTS


Page(s)

STATEMENT OF THE ISSUES . . . . . 2

STATEMENT OF FACTS . . . . . 2

I. Solicitation, Award, GAO Protest And Imposition Of Automatic Stay . . . . . 2

II. Consideration Of Risk Factors . . . . . 3

III. Override And Findings . . . . . 6

ARGUMENT . . . . . 8

I. Standard Of Review . . . . . 8

A. Substantive "Arbitrary And Capricious" Standard . . . . . 8

B. Standard For Preliminary Injunctive Relief . . . . . 9

II. The Government Is Entitled To Judgment Upon The Administrative Record . . 11

A. USFS's Determination And Findings Have A Rational Basis . . . . . 12

1. USFS Reasonably Concluded That The Benefits Of The Override Outweighed The Costs And Risks Of The Status Quo . . . . . 13

2. USFS Rationally Found That Existing Contractual Arrangements Were Not A Reasonable Alternative . . . . . 16

3. USFS Reasonably Considered The Possible Consequences Of A Reversal At GAO . . . . . 19

III. The Court Should Deny Plaintiffs' Motions For Injunctive And Declaratory Relief . . . . . 20

A. Plaintiffs' Claim For A Preliminary Injunction Should Be Denied . . . . . 20

1. No Irreparable Harm To Plaintiffs Would Result From Denying Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. The Harm To The United States Equals Or Outweighs The Harm To Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3. Denying Injunctive Relief Is In The Public Interest . . . . . . . . . . . 26

B. Plaintiffs' Claim For A Permanent Injunction Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C. Plaintiffs' Request For Declaratory Judgment Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page(s)**

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000) . . . . . 9

Advanced Systems Development, Inc. v. United States,
72 Fed. Cl. 25 (2006) . . . . . 28

Alion Science & Tech. Corp. v. United States,
69 Fed. Cl. 14 (2005) . . . . . 8, 12, 18

Automation Technologies, Inc. v. United States,
72 Fed. Cl. 723 (2006) . . . . . 19, 29

Bean Stuyvesant, L.L.C. v. United States,
48 Fed. Cl. 303 (2000) . . . . . 10

Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,
419 U.S. 281 (1974) . . . . . 9, 11

CACI, Inc. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) . . . . . 9

Camp v. Pitts,
411 U.S. 138 (1973) . . . . . 9

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) . . . . . 9

Chapman Law Firm Co. v. United States,
62 Fed. Cl. 464 (2004) . . . . . 9

Chapman Law Firm Co. v. United States,
65 Fed. Cl. 422 (2005) . . . . . 29, 30

CIGNA Gov't Servs., LLC v. United States,
70 Fed. Cl. 100 (2006) . . . . . 29

Co-Steel Raritan, Inc. v. ITC,
357 F.3d 1294 (Fed. Cir. 2004) . . . . . . . . . . 9

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) . . . . . . . . . . 10

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) . . . . . . . . . . 10

JWK Int'l Corp. v. United States,
52 Fed. Cl. 650 (2002),
aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003) . . . . . . . . . . 10

Keeton Corrections, Inc. v. United States,
59 Fed. Cl. 753 (2004) . . . . . . . . . . 22

Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . 12

Overstreet Elec. Co., Inc. v. United States,
59 Fed. Cl. 99 (2003) . . . . . . . . . . 21

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003) . . . . . . . . . . passim

PGBA, LLC v. United States,
382 F.3d 1819 (Fed. Cir. 2004) . . . . . . . . . . 25, 29

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999) . . . . . . . . . . 9

Reilly's Wholesale Foods, Inc. v. United States,
73 Fed. Cl. 705 (2006) . . . . . . . . . . 28

San Diego Beverage & Kup v. United States,
997 F. Supp. 1343 (S.D. Cal. 1998) . . . . . . . . . . 21

Saratoga Dev. Corp. v. United States,
21 F.3d 445 (D.C. Cir. 1994) . . . . . . . . . . 10

Sierra Military Health Services, Inc. v. United States,
58 Fed. Cl. 573 (2003) . . . . . . . . . . 22

Spherix, Inc. v. United States,
62 Fed. Cl. 497 (2004) . . . . . . . . . . 12, 19, 28

**FEDERAL STATUTES**

5 U.S.C. § 706(2) . . . . . . . . . . 8

28 U.S.C. § 1491(b)(2) . . . . . . . . . . 28

28 U.S.C. § 1491(b)(4) . . . . . . . . . . 9

31 U.S.C. § 3553 . . . . . . . . . . 11

31 U.S.C. §3553(d)(3)(A) . . . . . . . . . . 3, 10, 11

31 U.S.C. § 3553(d)(3)(C) . . . . . . . . . . 6

31 U.S.C. § 3553(d)(3)(C)(i)(I) . . . . . . . . . . 11

31 U.S.C. § 3554(b) . . . . . . . . . . 22

31 U.S.C. § 3554(b)(2) . . . . . . . . . . 22

48 C.F.R. § 33.104(c)(2) . . . . . . . . . . 11

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SUPERIOR HELICOPTER LLC, and RAINIER HELI-LIFT, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 07-518C (Judge Lettow) |
| ERICKSON AIR-CRANE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 07-519C (Judge Lettow) |

**DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTIONS**

Pursuant to Rules 52.1 and 65 of the Rules of the United States Court of Federal Claims, and the Court's July 13, 2007 order, defendant, the United States, respectfully submits the following motion for judgment upon the administrative record and opposition to the motions for a preliminary injunction, permanent injunction and declaratory relief filed by plaintiffs, Superior Helicopter LLC ("Superior"), Rainier Heli-Lift, Inc. ("Rainier") and Erickson Air-Crane, Inc. ("Erickson").[1]

[1] We are filing this brief in response to all three plaintiffs' claims. In response to the Court's question at the July 12, 2007 hearing, we believe that consolidation of the two cases is appropriate because the cases arise from the same override decision, involve review of the same administrative record, and share common issues of law and fact. In its brief, Erickson stated that it opposed consolidation because of a conflict of interest of its counsel; while we are sensitive to this concern, a conflict of counsel does not bear upon the merits of consolidation. In any event, the cases should be decided jointly.

## STATEMENT OF THE ISSUES

1. Whether the findings to override the automatic stay ("Findings") of the Forest Service, a component of the U.S. Department of Agriculture ("USFS" or "agency"), dated July 9, 2007, based upon urgent and compelling circumstances and the best interests of the United States, to continue with contract performance, are arbitrary, capricious, an abuse of discretion, or otherwise unlawful.

2. Whether the Court should preliminarily or permanently enjoin USFS from continuing performance of the contracts pending the GAO's decision in the absence of a showing of irreparable harm to plaintiffs and the balance of harms correspondingly favoring the Government.

## STATEMENT OF FACTS

### I. Solicitation, Award, GAO Protest And Imposition Of Automatic Stay

On April 6, 2007, USFS, a component of the United States Department of Agriculture, issued a Request for Proposals ("RFP"), AG-024B-S-07-0008, for 35 contract line items for helicopter services. See Solicitation (Tab 11); Findings ¶ 1 (Tab 2). A formal pre-proposal conference was conducted on April 18, 2007, discussing in depth the requirement of the solicitation. USFS issued amendments to the Solicitation on April 6, 2007 (Tab 12), April 26, 2007 (Tab 13), and May 1, 2007 (Tab 14). The April 6, 2007 amendment provided the agenda for the April 18, 2007 pre-proposal conference. AR 552. The April 26, 2007 amendment, among other changes, reissued the Solicitation, and superseded the April 6, 2007 version. AR 561. The May 1, 2007 amendment clarified certain technical requirements for Item 9

(Chuchupate Helibase), which none of the plaintiffs is protesting, and extended the due date for offers to the close of business on May 10, 2007. AR 760.

Offers were received by the close of business on May 10, 2007. On June 13, 2007, USFS notified 18 vendors that they were awarded contracts for 35 bases. On June 13 and 14, 2007, USFS notified unsuccessful offerors that awards would not be made to them. Findings ¶ 2.

Erickson, Superior and Rainier submitted proposals. USFS evaluated the proposals, but none of them was selected for the contract line items. Findings ¶¶ 3-5. All three are currently under contract with USFS, along with other vendors, to provide helicopter services upon a "call-when-needed" ("CWN") basis, however. See Erickson Mem. in Support of TRO ("Erickson Mem.") at 7-8; Superior and Rainier's Mem. in Support of TRO ("Superior Mem.") at 6.

On June 22, 2007, Erickson filed a bid protest with the Government Accountability Office ("GAO") (B299909.1). Tab 8 (Erickson Protest); Findings ¶ 3. Pursuant to 31 U.S.C. § 3553(d)(3)(A), an automatic stay of the awards went into effect. Superior and Rainier filed bid protests with the GAO on June 29, 2007 (B299909.2 and B299909.3). Tab 9 (Superior Protest); Tab 10 (Rainier Protest); Findings ¶¶ 4-5.

## II. Consideration Of Risk Factors

After the automatic stay took effect, Karyn Wood, Assistant Director for Wildlife Fire Operations at the National Interagency Fire Center ("NIFC")[2], wrote a memorandum to

---

[2] The NIFC coordinates firefighting efforts through the National Interagency Coordination Center ("NICC"). NICC is the focal point for coordinating the mobilization of resources for wildland fire and other incidents throughout the United States. Located in Boise, Idaho, the NICC also provides Intelligence and Predictive Services related-products designed to be used by the internal wildland fire community for wildland fire and incident management decision-making. More background information is available at www.nifc.gov.

contracting officer Frank Gomez in which she expressed concern with the heightened fire potential during the fire season and requested an override of the automatic stay:

> Due to the demands of the current fire season occurring nationwide, I am requesting you to continue operations of helicopters awarded on this year's national exclusive use solicitation. Several areas are currently experiencing "red flag" conditions and are forecast to continue through the weekend. On-going drought and high temperatures continue to maintain a high risk for the foreseeable future. Removal of this initial attack tool would present grave consequences to our capability to safely and effectively manage wildland fires.

AR 18 (Tab 4).

After receiving this request, USFS reviewed the available fire forecast information. On July 2, 2007, NIFC's Predictive Services issued its Wildland Significant Fire Potential Outlook, with projected significant fire potential outlook for July through October, 2007.[3] Tab 3. These dates covered, in large part, the anticipated duration of the GAO automatic stay. NIFC's outlook report stated, in part, that:

> Significant fire potential in July is expected to be higher than normal over much of the West, the western Great Lakes, the Ohio River and Tennessee Valleys, the central and southern Appalachians, and localized portions of southern Alaska. Fire potential in the West is expected to spread northward in August. Below normal fire potential is anticipated in portions of Texas, Oklahoma, Louisiana, and southern Florida.

AR 12 (Tab 3).

The NIFC outlook report also contains data regarding fires and acreage for previous years, year-to-date and projections. AR 17 (Tab 3). NIFC found that, "[b]ased on reported data

---

[3] In the outlook report, NIFC defines "significant fire potential" as "the likelihood that a wildland fire event will require mobilization of additional resources from outside the area in which the fire situation originates." AR 12.

so far this year, nationally there were 112% of the average numbers of fires, burning approximately 107% of the average acres." AR 17 (Tab 3).

USFS continued to monitor the fire potential and outlook. In the National Incident Information Center report of July 5, 2007 (Tab 15), there were reports of 47,779 fires for 2007 to date, compared to 59,189 for the entirety of the 2006 fire season, 50,155 for the 2000 fire season, and the ten-year average of 41,993. AR 764 (Tab 15). The report showed 1,929,122 acres burned for 2007 to date, compared to 3,870,506 acres for the 2006 fire season, 1,990,181 for the 2000 fire season and the ten-year average of 1,991,436 acres. AR 764 (Tab 15). As for forecasting, the report also listed a "red flag warning" for much of the western United States due to "low relative humidities and dry winds," and a "fire weather watch" for other areas. AR 766 (Tab 15). Thus, the data available to USFS showed that the number of fires and acreage burned by those fires was higher than several recent seasons already, with several summer months ahead.

USFS also considered the use and availability of helicopters after the automatic stay was imposed. The July 5, 2007 incident report stated that 55 helicopters had already been committed to firefighting activities. AR 764 (Tab 15); see also Findings ¶ 12(b) (AR10, Tab 2) ("The contingent of helicopters under current CWN contracts has been depleted, with vendors committing to work in the private sector and not having helicopters for guaranteed use by the Forest Service and its partners in firefighting efforts."). Moreover, USFS considered the records of helicopter requests. On July 9, 2007, the day that USFS made the override decision, USFS conducted a database search of its requests for Type I and Type II helicopters, and counted the 2007 orders that it was unable to fill ("UTF"). UTF Count Report (Tab 5). USFS was unable to fill orders for 13 Type 1 Limited, two Type 1 Standard, 11 Type 2 Limited, and five Type 2

Standard helicopters during the period of the search. AR 19 (Tab 5). Thus, USFS reasonably found that it was already unable to fill some orders, and faced a risk that it would be unable to do so during the protest period, which coincides with the hottest summer months.

## III. **Override And Findings**

After considering the facts available to it, USFS exercised its authority pursuant to 31 U.S.C. § 3553(d)(3)(C) to override the automatic stay of the awards. On July 9, 2007, USFS filed its determination and findings, signed by Hank Kashdan, Deputy Chief, who was Acting Chief on that day. Notice (Tab 1); Findings (Tab 2). In its determination and findings, USFS found that:

> It is critical that performance under the awarded contracts, specifically 34 of the 35 total contract line items contained in the solicitation, continue in the face of a protest. (Item 9 of the solicitation is specifically excluded from the protests.) The national helicopters are critical aviation resources needed for support of national fire suppression efforts, specifically initial attack and large fire support. These 35 helicopters are contracted for the exclusive use of the Forest Service and its National Wildfire Coordinating Group partners in the Department of Interior and the National Association of State Foresters. These helicopters are part of a national contingent of resources and are moved wherever needed on federal and state jurisdictional fires.

Findings ¶ 8.

USFS differentiated the "exclusive use" contracts under the current solicitation from the pool of "call-when-needed" helicopters that includes plaintiffs' helicopters:

> Under exclusive use contracts, such as the one that is the subject of the protests, the contractor is obligated to provide and station a helicopter and crew during mandatory availability periods as defined in the contract. . . . In contrast, helicopters under Call-When-Needed (CWN) contracts may be ordered by the Government if a specific need for them exists; however, the

> contractor is not obligated to accept those orders and, often, they do not, because the helicopter is not available due to other commitments the contractor might have. There is no availability rate paid or other guarantee that the Government will order that helicopter, and no requirement for the contractor to accept any orders under CWN contracts.

Findings ¶¶ 9-10.

Pursuant to these findings, among others, USFS determined that there were urgent and compelling circumstances, and that it was in the Government's best interests to override the stay and place an orders for services from the awardees:

> If performance is not continued, the Forest Service and its interagency partners (including states) will not have 35 medium and heavy helicopters available for their exclusive use for initial attack and large fire support, that have been inspected, approved for use, and stationed at designated locations with pilots and crews ready to deploy at a moment's notice. While some of these helicopters might be available under the call-when-needed contracts, there is no guarantee that enough of them will be available and in a state of readiness to deploy at a moment's notice when they are most urgently needed.

Findings ¶ 14.

The GAO's decision is due on October 1, 2007, for the Erickson protest, and October 9, 2007, for the Superior and Rainier protests.

On July 11, 2007, Plaintiffs filed suit in this Court. Erickson seeks declaratory relief that the automatic stay and authorization of contract performance for 18 of the 35 helicopter contracts was "arbitrary, capricious, an abuse of discretion, and otherwise not in conformance with law," and an injunction preventing USFS from authorizing the automatic stay or authorizing contract performance of 18 of the 35 helicopter contracts. See Erickson Complaint (July 11, 2007) at 4-5. Superior and Rainier seek declaratory relief that the USFS's determination and findings are

"unjustified and without legal authority," and an injunction to "enjoin the USFS from overriding the automatic stay until the GAO issues its decisions on Plaintiffs' protests" with respect to 34 of the 35 helicopter contracts. Superior Complaint (July 11, 2007) at 6.

USFS sent notice to the awardees of the existence of the suit and the hearing on the temporary restraining order motion. E-mail Notification To Awardees, AR Tab 7. On July 12, 2007, after limited briefing and a hearing, the Court denied plaintiffs' application for a temporary restraining order and ordered further briefing. See Order (July 13, 2007). Plaintiffs filed their briefs on July 26, 2007. See Erickson Brief (July 26, 2007) ("Erickson Br."); Superior and Rainier Corrected Initial Br. (July 26, 2007) ("Superior Br.").[4]

## ARGUMENT

### I. Standard Of Review

#### A. Substantive "Arbitrary And Capricious" Standard

In a procurement-related challenge, the Court assesses the agency's decision pursuant to the review standard of the Administrative Procedure Act, 5 U.S.C. § 706(2), as incorporated by

---

[4] We note that Erickson has attached a second affidavit from Lannis Allmaras, North America and Australia Firefighting Program Manager for Erickson, responding to the documents in the administrative record. See Second Allmaras Aff. (attached to Erickson Br.). Similarly, Superior and Rainier have referred to presenting the testimony of an unspecified live witness to testify at the hearing to rebut the claims as to helicopter availability and the UTF report. Superior Br. at 6. Just as plaintiffs' attachment of affidavits and presentation of testimony at the TRO hearing with respects to the merits issue was improper, this affidavit attachment and proposed testimony are improper and should be given no weight by the Court. Similarly, plaintiffs' citations to statements at the TRO hearing by the witness offered by Superior, counsel and the Court should be ignored. See Alion Science & Tech. Corp. v. United States, 69 Fed. Cl. 14, 31 (2005) ("Therefore, plaintiff was required to articulate the foundation for its arguments *based on the administrative record* or, if no support could be found for its arguments, *appropriately supplement the record with supporting documents*.") (emphasis in original). Nevertheless, given the short time frame, we will address the arguments presented in the additional material, even though the Court should deny the implicit motion to add them to the record.

the Tucker Act, 28 U.S.C. § 1491(b)(4). RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1291 (Fed. Cir. 1999). Thus, plaintiffs must "prov[e] that the override decision here was arbitrary and capricious." PGBA, LLC v. United States, 57 Fed. Cl. 655, 660 (2003).

Application of the arbitrary and capricious standard involves neither judicial fact finding, nor review of the agency's factual statements for "substantial evidence." See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411 U.S. 138, 140 (1973)). Rather, the Court will sustain an agency decision "evincing rational reasoning and consideration of relevant factors." Id. at 1058 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)). The Court should ask whether there has been "a clear error of judgment," without substituting its own judgment for that of the agency. See, e.g., Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004). Consequently, in the context of this action, the Court should simply assess whether the written determination and finding of the USFS supplies "a rational basis" for the agency's determination to continue contract performance. Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 466 (2004).

### B. Standard For Injunctive Relief

Injunctive relief for a disappointed bidder is appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting CACI, Inc. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). In order to obtain injunctive relief, a plaintiff must establish: (1) actual (or a likelihood of) upon the merits; (2) that it will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to the plaintiff will outweigh the harm to the Government and third parties; and (4) that

granting the injunction serves the public interest. Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000); PGBA LLC v. United States, 57 Fed. Cl. 655, 657 (2003).

The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). "[I]n the context of the review of an agency's best interests determination under the APA standard, even if the court were to find that [the agency's] actions were arbitrary and capricious, it still examines the other factors of the preliminary injunction analysis to determine whether a preliminary injunction should issue." Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 192 n.2 (2005) (citing FMC, 3 F.3d at 427).

In evaluating whether an agency official's actions were rational, the "'disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). Courts have recognized that contracting officials may properly exercise wide discretion in applying procurement regulations. See id. at 1332; Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985).

The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which consider[s] the relevant factors and is within the bounds of reasoned decisionmaking." JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n. 8 (2002), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003) (quotation omitted). In this regard, the Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions.

Bowman, 419 U.S. at 285-86 (1974). Therefore, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be sustained.

## II. The Government Is Entitled To Judgment Upon The Administrative Record

Pursuant to 31 U.S.C. § 3553(d)(3)(C), an agency may override the automatic stay upon a written finding that:

> [P]erformance of the contract is in the best interests of the United States; or urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(I); see also 48 C.F.R. § 33.104(c)(2). In this case, USFS overrode the stay pursuant to both the "urgent and compelling circumstances" and "best interests" provisions of the statute. Findings ¶ 15.

The Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553, grants an agency significant discretion in choosing to override an automatic stay. Indeed, by enacting section 3553(d)(3)(C), Congress granted agencies even greater discretion in overriding automatic stays in the post-award context than in the pre-award context. Pursuant to 31 U.S.C. § 3553(c)(2), an automatic stay entered prior to contract award may be overridden only "upon a writing finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General." 31 U.S.C. § 3553(c)(2)(A). In post-award actions, by contrast, an agency has the additional option of overriding an automatic stay upon the more subjective finding that "performance of the contract is in the best interests of the United States." 31 U.S.C. § 3553(d)(3)(C)(i)(I). Post-award, a finding of "urgent and compelling circumstances" is not required. Id. In granting agencies the additional option of

overriding an automatic stay when it is in the best interests of the United States, Congress recognized that the circumstances requiring an override may vary widely, and it granted agencies substantial discretion in making that determination.

Although a finding pursuant to either provision allows an agency to override an automatic stay, the standard of review for a "best interests" determination differs from that of an "urgent and compelling circumstances" determination. This Court has also recognized that the "best interests" exception may provide agency officials with "a lower standard for overriding a stay," although situations in which the Government's "best interests" would not involve "urgent and compelling" circumstances may be unusual. Alion Science & Tech. Corp. v. United States, 69 Fed. Cl. 14, 17 (2005); (quoting Spherix, Inc. v. United States, 62 Fed. Cl. 497, 505, 507 (2004)).

**A. USFS's Determination And Findings Have A Rational Basis**

An agency's decision may be arbitrary and capricious where the agency: (1) "has relied on factors which Congress has not intended it to consider;" (2) "entirely failed to consider an important aspect of the problem;" (3) "offered an explanation for its decision that runs counter to the evidence before the agency;" or (4) if the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983). Those flaws are absent from the written finding under review. Plaintiffs bear the burden to demonstrate error in the written determination and finding. PGBA, 57 Fed. Cl. at 660.

### 1. USFS Reasonably Concluded That The Benefits Of The Override Outweighed The Costs And Risks Of The Status Quo

USFS explained the bases for its decision in its decision memorandum of July 9, 2007. It weighed the competing factors of public safety, potential for delay, cost and potential ramifications of the protests being sustained by GAO, and concluded that the override was in the best interest of the United States. This court has previously found that public safety is an appropriate justification for an override, particularly where, as here, the agency finds an increased risk of adequate services not being performed during the protest period. See Chapman, 67 Fed. Cl. at 194-95 ("public safety" concern of "risk" and "possibility" that buildings will not be properly managed during override period sufficient to sustain override). USFS made such a finding here, based upon its experience in terms of firefighting needs and helicopter availability, primarily due to the risk of services not being adequately performed during the protest period due to the limited availability of helicopters. Such a finding satisfies the requirements of CICA and is neither arbitrary nor capricious.

As the administrative record demonstrates, the risk USFS perceived of being unable to guarantee helicopter services at the time and in the quantity required was not merely academic. At the time of the override, USFS rationally surveyed the facts available with respect to risk of fire potential and concluded that the risk was above-average due to weather conditions and the number of fires that have already occurred this year. AR 12(Tab 3) (higher-than-average significant fire potential); AR 18(Tab 4) ("red flag" warning); AR 764-66(Tab 15) (higher-than average fire count, "red flag" warning). At the same time, USFS had facts before it showing that it had already deployed 55 helicopters, and that it was unable to fill at least 25 orders. AR 764(Tab 15)

(helicopters deployed); AR 19(Tab 5) (UTF report). The combination of these factors rationally led USFS to its conclusion that the automatic stay imposed a risk of being unable to "guarantee that enough [helicopters] will be available and in a state of readiness to deploy at a moment's notice when they are most urgently needed." Findings ¶ 14 (AR 11, Tab 2).

Plaintiffs' response to these findings of increased fire risk and limited availability is to second-guess the evidence. Superior and Rainier simply say that they will present unspecified "testimony at the hearing" to rebut the UTF report based upon a claim that, in the past, orders had been deemed unable to fill due to a lack of managers rather than a lack of available helicopters, and suggest that this is the reason for the UTF report. Superior Br. at 6. The Court should not permit, and cannot rely upon, any such testimony because it is not part of the administrative record. Moreover, even if the Court were to permit such testimony, this argument is pure speculation, and finds no basis in the record.

Similarly, Erickson argues that, "the UTF report includes unfilled orders under both exclusive use and CWN contracts and contains no data upon which the Chief could have reasonably relied to conclude that there were an insufficient number of CWN helicopters available to meet the Forest Service's firefighting needs," but this, too, is simply second-guessing the evidence. If the pool of exclusive-use and CWN contracts, taken together, still renders 25 orders that USFS is unable to fill, then that fact supports USFS's determination that the supply of CWN helicopters has been "depleted." Findings ¶ 12(b) (AR 10, Tab 2).

Plaintiffs also claim that USFS erred in not quantifying the expected costs and benefits from the override decision more explicitly than it did. Erickson Br. at 14-17; <u>see also</u> Erickson Mem. at 7, 12-13; Superior Mem. at 8-9. However, any claim that USFS acted irrationally in not

documenting any projected cost difference in advance is unsupported by the record because the override decision was not based upon cost factors. The administrative record demonstrates that USFS did not base its override decision upon a projection of costs other than to note in its Findings that the exclusive use contracts may tend to provide the services at a lower cost than the typical CWN resource." Findings ¶ 12(b) (AR 10, Tab 2). Neither in its Findings nor in the record did USFS seek to weigh the financial cost against the safety concern; to the contrary, USFS stated that, "the significant risks that would result from not overriding the stay – i.e., the inability to guarantee helicopter availability and therefore to prevent loss of life and property – outweigh the ramifications of any sustained bid protests." Findings ¶ 13 (AR 11, Tab 2). Any claim that USFS's Findings and record, all of which looked only at the safety aspects of the decision, were in fact concerned with cost factors is therefore unsupported.

Even if the Court were to inquire into whether USFS's decision were justified based upon cost factors, such a calculation would be inappropriate here. Cost projections of helicopter usage and the impact of additional fire activity can not be performed with mathematical precision in the case of firefighting needs that are dependent upon the amount of fire activity. Such a projection is, by its nature, imprecise. Similarly, the costs of a reversal at GAO are unknowable in advance. The factors considered by USFS, such as the number of helicopters available for a given fire, the time needed to obtain a helicopter for a given fire, or the total cost of firefighting activity, all depend upon the amount of fire activity and the number of helicopters available (i.e., that are in service, not assigned to other fires, not contracted for work in the private sector, etc.). Such calculations are, by their nature, projections, and therefore not susceptible to a precise weighing in advance.

**2. USFS Rationally Found That Existing Contractual Arrangements Were Not A Reasonable Alternative**

Plaintiffs argue that USFS could achieve the same level of services during the stay period by utilizing the CWN contracts, by extending previously expired exclusive use contracts, or by doing both. Erickson Br. at 9-14; see also Erickson Mem. at 10; Superior Mem. at 6-7. USFS considered these alternatives, however, and found them inadequate. USFS considered alternatives to the override and concluded that the override was necessary to maintain the required services during the protest period. Findings ¶¶ 12-14. We considered plaintiffs' previous arguments with respect to the availability of alternatives and responded to them in our previous briefing. See Def. Opp. TRO at 10-13.

Erickson argues that it would be amenable to extending an exclusive use contract it had with USFS, which USFS terminated upon the notice to proceed with the new contracts. Erickson Br. at 12-13; see also Findings ¶ 12(a). Erickson also alleges that other contractors also had exclusive use contracts with USFS that were ended by the entry of the new contracts, and that it expects that the other contractors would be willing to extend their exclusive use arrangements as well. This claim is speculative because neither Erickson, nor the other operators alluded to, are under any contractual obligation to provide such helicopters. Moreover, USFS concluded that many contractors whose bids for the new contracts were rejected, including Erickson, were rejected because their bids were technically unacceptable. Findings ¶ 12 (c).

Furthermore, in its second affidavit, Erickson states that, at most, USFS could use the previous contracts to obtain "some of the 18 helicopters needed to meet its firefighting needs during the stay." Second Allmaras Aff. at ¶ 9. Given that the automatic stay in Erickson's case

would bar 18 helicopters from exclusive use, and that a stay based upon Superior and Rainier's protest would similarly bar 34 helicopters (including Erickson's 18), even the strongest reading of Erickson's argument demonstrates that USFS could not meet the level of exclusive use helicopters it deemed necessary in its Findings through the use of these now-terminated contracts.

Erickson's fallback position is that USFS can meet its firefighting needs "using a blend of the preexisting exclusive use and CWN contracts." Erickson Br. at 10; see also Superior Br. at 5-6. This claim, however, depends upon speculation as to the level of fire activity and the availability of helicopters from Erickson and other operators. USFS specifically found that the supply of CWN helicopters had been "depleted, with vendors committing to work in the private sector and not having helicopters for guaranteed use by the Forest Service and its partners in firefighting efforts." Findings ¶ 12(b). USFS also found that only approximately 40 percent of the Type I and Type II helicopters were available for CWN firefighting as of the date of the override, further underscoring that the total number in the available pool can change. Findings ¶ 12(b). The prior contractual arrangements therefore do not enable USFS to guarantee either a fixed number of helicopters or the needed number at any given time.

Erickson further argues that, "nothing has changed between previous years and this year other than the Forest Service's decision that using exclusive use contracts is preferable to replying principally upon CWN contracts. Neither life nor property will be placed at risk by keeping the automatic stay in place because the Forest Service can procure all needed services under its existing contracts." Erickson Br. at 13-14. This argument, however, ignores what has changed, namely USFS's finding that the elevated fire risk for this season justified the need for

exclusive use helicopters. USFS's facts in the record show that the projected fire risk in this season was higher than that of several past seasons. Findings ¶ 11; Tabs 3, 4, 15. Furthermore, USFS found that, as of the date of the override, it was unable to fill numerous orders using its preexisting contractual arrangements. Tab 5. These factors, considered together, support USFS's finding that, despite its efforts, it could not guarantee the required level of availability during the override. Findings ¶ 13.

Erickson builds upon its claim that USFS could meet its needs for guaranteed availability during the override period by pre-positioning CWN helicopters before the outbreak of a fire. Erickson Br. at 13, 25. However, Erickson admits that this would either be done by placing orders for CWN helicopters prior to the outbreak of fire, or relying upon operators to position their helicopters prior to the outbreak of a fire at their own expense, neither of which the CWN operators are contractually obligated to do. Second Allmaras Aff. at ¶¶ 7-8. Furthermore, relying upon private operators to pre-position their helicopters would not enable USFS to use its own planning resources to pre-position the helicopters, thus possibly affecting the effectiveness of the overall firefighting effort. Correspondingly, relying upon CWN operators to position their helicopters without contractual obligation, and often at their own expense, is the definition of "inability to guarantee helicopter availability." Findings ¶ 13 (AR 11, Tab 2).

All of these findings show that USFS rationally considered the relevant factors and weighed them in making its decision. In doing so, USFS properly exercised its discretion in finding a risk that it could not guarantee the necessary level of performance during the protest period without the override. See, e.g., Alion, 69 Fed. Cl. at 29 (finding that override was rational based in part on finding that agency had originally tried to obtain a level of service required by its

changing mission requirements from its existing contractors, including plaintiff); Chapman, 67 Fed. Cl. at 194-95 ("risk" of disruption of services supported override); Spherix, 62 Fed. Cl. at 506 (disruption to program for busiest season supported override). USFS's decision therefore had a rational basis.

### 3. USFS Reasonably Considered The Possible Consequences Of A Reversal At GAO

Plaintiffs again raise the claim USFS did not properly weigh the impact of a reversal at GAO in its decisionmaking process. Erickson Br. at 14-17. We previously responded to these arguments in our TRO opposition brief. See Def. Opp. TRO at 14. Despite plaintiffs' continuing claims that USFS did not properly "weigh" the costs of a reversal against the need for continued performance, USFS did not base its decision based upon anticipated cost but rather effectiveness. "[T]he significant risks that would result from not overriding the stay – *i.e.*, the inability to guarantee helicopter availability and therefore to prevent loss of life and property – outweigh the ramifications of any sustained bid protests." Findings ¶ 13. USFS did not discuss cost other than a passing reference to exclusive use contracts being of lower cost than "typical" CWN contracts. Findings ¶ 12(b). This is not a failing of USFS's approach but rather supports their finding that their decision was driven by effectiveness rather than cost savings.

Moreover, even in the event of a reversal at GAO, assuming that USFS terminates the new, exclusive use contracts for convenience, it would not suffer a disruption to its work practices other than the return to the CWN arrangement. This differentiates this case from cases where an agency was found not to consider the loss of effectiveness in its processes from switching from one contractor to another on a continuing project. See, e.g., Automation

Technologies, Inc. v. United States, 72 Fed. Cl. 723, 730 (2006) (citing failure to consider "ramifications of an agency loss in the GAO protest").

## III. The Court Should Deny Plaintiffs' Motions For Injunctive And Declaratory Relief

Plaintiffs argue, in the alternative, for a preliminary injunction, permanent injunction and for declaratory judgment. All of these claims should be denied because USFS acted rationally in making the override decision. Even if the Court were to find that the override decision was not rational, however, this does not end the inquiry because plaintiffs still must demonstrate their entitlement to injunctive relief. Plaintiffs' claim for preliminary injunctive relief should be denied because, even if the Court finds that the agency's override did not have a rational basis, plaintiffs have shown neither irreparable harm nor the likelihood of harm. A forward-directed permanent injunction, which would enjoin USFS from overriding the automatic stay until the conclusion of the GAO protest (as Superior and Rainier request and Erickson may be requesting), would be inappropriate in any event because it would foreclose the possibility of USFS reacting to later events that would justify an override. Lastly, plaintiffs' claim for declaratory relief should not exempt plaintiffs from demonstrating the injunctive relief factors because such a claim would be in the nature of injunctive relief if it were to have any effect.

### A. Plaintiffs' Claim For A Preliminary Injunction Should Be Denied

Plaintiffs' claim for a preliminary injunction should be denied because plaintiffs have not established a likelihood of success upon the merits (or actual success upon the merits, in the case of a motion for judgment upon the administrative record) for the reasons discussed above. In addition to the lack of success on the merits, plaintiffs' request for a preliminary injunction should be denied because, as is discussed below, plaintiffs have not shown a likelihood of

irreparable harm, a balance of hardships in their favor, or that an injunction would be in the public interest. We have previously responded to plaintiffs' arguments with respect to the injunctive relief standards in responding to their applications a temporary restraining order, and will not repeat those arguments here. See Def. TRO Opp. at 15-21.

Apart from the merits of USFS's override decision, the balance of harms warrants a denial of preliminary injunctive relief. Indeed, no irreparable harm to plaintiffs would flow from a denial of injunctive relief, whereas the harm to United States from an injunction would be substantial and virtually immediate. The Court should, therefore, deny plaintiffs' request. PGBA, 57 Fed. Cl. at 657; Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 109 (2003) (listing equitable factors and noting "[c]ourts interfere with the government's procurement process only in extremely limited circumstances").

### 1. No Irreparable Harm To Plaintiffs Would Result From Denying Injunctive Relief

Plaintiffs fail to establish that they would suffer any irreparable injury from a denial of preliminary injunctive relief. Plaintiffs' main argument is simply that they will be deprived of the exclusive use contracts they would like to perform. "Normally, an injury is not considered 'irreparable' if the only injury alleged is monetary loss." Chapman, 67 Fed. Cl. 188 (2005) (sustaining override). Loss of business is not irreparable harm. "In every procurement award there are generally more losers than winners. To find that a losing procurement participant suffers irreparable harm merely because it did not succeed with its contract proposal would create in the losing party an automatic right to injunctive relief." San Diego Beverage & Kup v. United States, 997 F. Supp. 1343, 1347 (S.D. Cal. 1998).

Moreover, as we pointed out in our previous briefing, any claim of injury to plaintiffs is speculative because plaintiffs would not have been working under the exclusive use contracts during the protest period in any event, their helicopters form a relatively low percentage of the pool of CWN helicopters, and plaintiffs could still receive work under their existing CWN contracts. See Def. Opp. TRO at 15-17. Thus, plaintiffs' claims of irreparable harm are speculative, unlike cases involving an incumbent contractor that was performing the bulk of the contract during the protest period. See PGBA, 57 Fed. Cl. at 664 ("advantages associated with its incumbency"); Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753, 756 (2004) ("Keeton could continue to perform during the protest period").

Erickson repeats its claim that it will lose the "opportunity to compete" for the new exclusive use contracts as a consequence of the stay. Erickson Br. at 22. However, such a claim is unfounded because plaintiffs will not receive the exclusive use contracts in any event during the protest period. Furthermore, it is unlikely that the new awardees would gain an advantage in recompetition due to having performed during the protest period because the helicopter services are largely fungible and plaintiffs will still have the opportunity to perform under their current CWN contracts. Moreover, even if there were any such advantages, the GAO and USFS would omit them from consideration in conducting any reevaluation of the bids. See 31 U.S.C. § 3554(b)(2) ("the Comptroller General shall make recommendations under this subsection without regard to any cost or disruption from terminating, recompeting, or reawarding the contract"); Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573, 583 (2003) (Court favorably cited 31 U.S.C. § 3554(b) in finding no irreparable harm).

Plaintiffs also argue that they will be irreparably harmed by potentially losing business under the CWN contracts they currently have with USFS. Erickson Br. at 14-17. However, plaintiffs have not pointed to lost work opportunities since the imposition of the override in the merits briefs. This is unsurprising because, in fact, plaintiffs have not lost work opportunities under their CWN contracts since the imposition of the override. To the contrary, USFS's helicopter dispatch records since the override show that USFS has consistently used plaintiffs' CWN helicopters since the override. See Helicopter Availability Report (attached as Exhibit A, submitted solely for injunctive relief consideration). Although this usage – and, correspondingly, the benefit or harm to plaintiffs – is dependent upon fire activity, the data so far during the override period demonstrate that plaintiffs have not been harmed, or even affected, by the override. Any claim that plaintiffs have been, or will be, harmed by the stay is mere speculation.

In addition to these arguments, Erickson raises in its merits brief a claim that it will be the "only party threatened with real injury" based upon its claim that it could provide CWN services under its current contract and could possibly have provided exclusive use additional helicopters under clause C-33 of its now-expired exclusive use contract with USFS for two helicopters. Erickson Br. at 25. This claim is incorrect for several reasons. First, neither Erickson nor any other CWN contractor is promised to have any particular level of usage, and, given the small percentage of CWN helicopters represented by Erickson, any claim of lost incremental usage is purely speculative. Second, Erickson's exclusive use contract was terminated upon the notices to proceed to the new awardees. Third, even if Erickson's prior exclusive use contract were assumed to be in effect, that contract was for only two helicopters, as opposed to the 18 exclusive use helicopters held up by Erickson's GAO protest, and 34 exclusive use helicopters (including

the 18 from Erickson's) held up by Superior and Rainier's protest. Even if the Court were to credit Erickson's claim that it could extend additional exclusive use helicopters – which was not a contractual requirement even under Erickson's now-expired exclusive use contract for two helicopters – Erickson makes no representation that it would have the capacity to add all of the helicopters required by USFS. See Second Allmaras Aff. at ¶ 9 ("some of the 18 helicopters"). Erickson's claim that it would be uniquely harmed by the override is therefore unsupported.

### 2. The Harm To The United States Equals Or Outweighs The Harm To Plaintiffs

The harm to the Government equals or outweighs any potential harm to plaintiffs because the operation of the automatic stay will serve to deprive USFS of most or all of the services on the exclusive use contracts. The exclusive use contracts are scheduled to last until March 31, 2008, with mandatory availability periods last between 90 and 180 days, depending on the contract. Because the GAO protest period lasts 100 days (through October 1 for Erickson's protest and October 9 for Superior's and Rainier's), the automatic stay would essentially eliminate most or all of the 2007 mandatory availability period under the exclusive use contracts. Thus, USFS's override will not impair plaintiffs' post-protest ability to receive an award because, in most cases, there would be no mandatory availability period for exclusive-use contracts for 2007 at all absent an override of the stay.

Some of the contracts call for renewal by the agency for the next year's fire season. Even if the GAO were to find in favor of plaintiffs at the conclusion of the protest period, however, the balance of harms would still favor the Government. If GAO found in favor of plaintiffs, USFS would then presumably be required to recompete the contracts after the protest period, but this

would not enable plaintiffs to obtain the exclusive use contracts for this fire season, which will have ended in most cases by October 1, 2007. If USFS were to prevail, on the other hand, the exclusive use contracts would simply be in position to be renewed for the next fire season. Plaintiffs will not gain during this fire season, but the Government would be harmed.

Moreover, when balancing the respective harms that can flow from the grant of, or failure to grant, an injunction, the Court may take into account not only the potential harm to the plaintiff and to the government, but also potential harm to third parties. Chapman, 67 Fed. Cl. at 193 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1230 (Fed. Cir. 2004)). In PGBA, the Federal Circuit upheld the trial court's denial of an injunction, after finding that any injunctive remedy would create administrative and financial burdens for the Government, as well as possibly create risks for third parties.

USFS considered these risks, including the risks to third parties from fire potential, in making its determinations. Findings ¶ 11; Tabs 3, 4, 15. Given USFS's finding of increased fire potential, the potential harm to the United States, as well as to third parties, outweighs any potential harm to plaintiffs.

Erickson's response is simply to reiterate the claim that, "If this Court issues the requested injunction, the Forest Service can readily procure all necessary helicopter firefighting services by extending preexisting exclusive use contracts, ordering additional helicopters under them, and ordering helicopters under its existing CWN contracts." Erickson Br. at 25. What services are "necessary," however, is a determination for USFS to make, not plaintiffs. In support, Erickson argues, that, "[f]or example, the Forest Service can place CWN orders for 18 heavy and medium helicopters, position them in the same locations listed in the subject

solicitation, and not release them until GAO issues its decision in Erickson's protest. See Ex. 2 (Sec. Dec. of L. Allmaras ¶ 7)." Erickson Br. at 25.

However, the affidavit cited by Erickson makes clear that this arrangement is only possible "once an operator accepts an order under its CWN contract," a condition which is not guaranteed. Second Allmaras Aff. at ¶ 7. Therefore, even by the terms of Erickson's argument, a CWN contract arrangement cannot guarantee the availability of helicopters as a general principle. Because USFS's findings and record show that this particular season has been particularly difficult in retaining sufficient numbers of CWN helicopters, plaintiffs' representations do not lead to a conclusion that USFS can "readily procure" all needed services under its previous contracts.

### 3. <u>Denying Injunctive Relief Is In The Public Interest</u>

USFS's primary basis for the override is its finding that having the helicopters available for exclusive use would increase public safety by having a <u>guaranteed</u> source of helicopters available for a national fire strategy. Such a determination is within the public interest, and is within the USFS's core responsibility for coordinating the national fire effort. USFS has thus determined that the override is in the public interest. This Court has previously found that public safety is an appropriate justification for an override, particularly where, as here, the agency finds an increased risk of adequate services not being performed during the protest period. <u>See</u> <u>Chapman</u>, 67 Fed. Cl. at 194-95 ("public safety" concern of "risk" and "possibility" that buildings will not be properly managed during override period sufficient to sustain override).

Plaintiffs' primary response to USFS's finding is their claim that overriding the stay would affect public confidence in the integrity of the procurement process. Erickson Br. at 24.

This claim is unfounded. To be sure, preserving competition is one of the main purposes of the CICA stay, and it would affect public confidence if stays could be arbitrarily or capriciously overridden. However, there is no suggestion here that the agency has attempted to break or evade the rules of competitive contracting.

Erickson also argues that an override in this instance would be of particular harm because of the risk that an agency could perceive itself as immune from consequences from overturning a short-term contract. Erickson Br. at 24. However, all GAO override stay determinations are, by their nature, short-term, and the statute does not distinguish based upon the length of the contract in allowing agencies to make override decisions. The shortness of the fire season only magnifies the need for performance during that period, and the GAO stay would prevent any of that performance from happening under the new contracts. Thus, the public interest particularly favors allowing performance of new short-term contracts during the GAO protest period if the agency makes the appropriate findings, when to do otherwise would deprive the public of the services entirely.

**B. Plaintiffs' Claim For A Permanent Injunction Should Be Denied**

Plaintiffs' motion for a permanent injunction should be denied for the same reasons as their request for a preliminary injunction. Furthermore, due to the nature of the override stay process, a forward-directed permanent injunction would be an inappropriate remedy regardless of the Court's findings as to the appropriateness of the override. Superior and Rainier request such an injunction; it is unclear whether Erickson does as well. See Superior Complaint at 6 ("enjoin the USFS from overriding the automatic stay until the GAO issues its decisions on Plaintiffs' protests"). Such a forward-directed permanent injunction would prevent USFS from overriding

the stay based upon any later events that would come up after the date of judgment. Because the Court's review is a record review, it would be improper for the Court to prohibit a future override when circumstances could change after the Court's judgment.

### C. Plaintiffs' Request For Declaratory Judgment Should Be Denied

Plaintiffs' request for declaratory judgment should fail because, as discussed above, USFS's override decision had a rational basis. Even assuming that the Court concludes otherwise, the Court should still consider the injunctive relief factors before deciding whether to grant any relief, whether declaratory or injunctive. Although the governing statute, 28 U.S.C. § 1491(b)(2), does permit the Court to employ either declaratory or injunctive relief, declaratory relief may not require USFS to reverse the override because it would not be equivalent to an injunction. Therefore, in order to grant the type of relief plaintiffs seek, the Court should consider the injunctive relief standards.

This Court has considered the application of the injunctive relief standards in several cases dealing with override decisions with varying conclusions. Compare Spherix, Inc. v. United States, 62 Fed. Cl at 502 n.2, 503 ("Declaratory relief with remand has not been shown to be the proper relief in circumstances such as these. . . . Remand is not the proper relief, if plaintiff is deserving of any relief. Instead, as intervenor properly notes in its brief, this is an action for injunctive relief."); Reilly's Wholesale Foods, Inc. v. United States, 73 Fed. Cl. 705, 709 n.7 (2006) ("Moreover, this court doubts whether, as several of these cases have stated, a declaration, that could immediately be superseded by a new override decision, is the equivalent of an injunction. Accordingly, at least in the circumstances presented, the court believes that injunctive relief is the more appropriate remedy."); with Advanced Systems Development, Inc. v.

United States, 72 Fed. Cl. 25, 36-37 (2006); Automation Technologies, Inc. v. United States, 72 Fed. Cl. 723, 730 n.5 (2006); CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 103-04 (2006); Chapman Law Firm Co. v. United States, 65 Fed. Cl. 422, 424 (2005) (granting declaratory relief that automatic stay is invalid without reaching injunctive relief standards).

To our knowledge, the Federal Circuit has not squarely faced the issue of whether it is necessary to apply the injunctive relief standards in deciding whether to grant declaratory relief in the context of a GAO stay override. However, the Federal Circuit has upheld this Court's finding that it is necessary to consider the remaining injunctive relief factors in deciding whether to overturn a contract award made in a post-award bid protest, even when the Court found that the agency's action was arbitrary and capricious. See PGBA, 60 Fed. Cl. 196 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004). The same approach is appropriate here, where plaintiffs' request to reverse the override "amount[s] to a prayer for injunctive relief." PGBA, 389 F.3d at 1228. Indeed, given that the declaratory relief plaintiffs seek would have the same practical effect as an injunction, but would have a lower standard, as Erickson explicitly argues, see Erickson Br. at 6-7, 21, it would be illogical to hold plaintiffs to a lower standard. See PGBA, 389 F.3d at 1228 n.6 ("The [United States Supreme Court] has recognized that different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other. For example, irreparable injury must be shown in a suit for an injunction, but not in an action for declaratory relief. A declaratory judgment is also generally less coercive because it is merely a declaration of legal status or rights, whereas an injunction either mandates or prohibits particular conduct.") (citations and quotations omitted).

At most, a declaratory judgment would have the effect of declaring the current stay invalid but leaving open the possibility to a further override if changing conditions so require. Even decisions of this Court holding that declaratory judgment could be granted without reference to the injunctive relief standards have found that the Court must consult the injunctive relief standards if it were to grant an injunction spanning the entire GAO protest period. See Chapman, 65 Fed. Cl. at 424 ("It is recognized that there are circumstances where a party might seek to enjoin an agency from exercising its statutory override authority throughout the entire GAO protest period rather than simply contesting the validity of a specific override determination. To enter such an injunction, this court must, of course, consider the relevant equitable factors.") (citation omitted). As the override stay review is a record review, this is the most appropriate course, if the Court were to grant any relief to plaintiffs.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our motion for judgment upon the administrative record, and deny plaintiffs' motions for judgment upon the administrative record, for preliminary and permanent injunctive relief, and for declaratory judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ John J. Todor
JOHN J. TODOR
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St., N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel.: (202) 616-2382
Fax: (202) 514-8640

OF COUNSEL:
ELIN M. DUGAN
U.S. Department of Agriculture
Office of General Counsel
1400 Independence Avenue
Mail Stop 1415
Washington, D.C. 20250

August 2, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on August 2, 2007, a copy of foregoing "DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTIONS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John J. Todor